# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____ )
Rockwell Automation, Inc.                )
                   Plaintiffs,    )     Civil No. 15-05246 (RBK/JS)
       v.                        )
                              )     **Opinion**
Radwell International, Inc.,       )
                   Defendants.   )
_____ )

**KUGLER**, United States District Court Judge

Before the Court in this action concerning, among other things, trademark

infringement is a motion ["the motion"] (ECF Doc. 331) of defendant Radwell International,

Inc. ["Radwell"] against plaintiff Rockwell Automation ["Rockwell"] under Federal Rule of Civil

Procedure ["Fed. R. Civ. Proc." or "Rule"] 56(a) for partial summary judgment on Counts I,[1] III,[2]

and V[3] of plaintiff's second amended complaint ["the complaint"] (ECF Doc. 140). The motion

is based on the argument in ECF Doc. 331-1 that recent United States Supreme Court authority

ends the judge-made "material difference" theory of trademark infringement and therefore

these Counts fail.

**The COURT HAVING REVIEWED** the parties' submissions without a hearing as

endorsed by Rule 78.1 (b), and for the reasons below, and for good cause shown,

**The Court DENIES** the motion for partial summary judgment as to Counts I, III, and V

of the complaint. An appropriate Order accompanies this Opinion.

---

[1] Trademark Infringement under 15 U.S.C. §1114 (Lanham Act)
[2] False Designation of Origin under 15 U.S.C. §1125(a)(1)(A) (Lanham Act)
[3] Statutory Unfair Competition under N.J. Stat. Ann. §56:4-1 *et seq.*

## 1.0    Background and Procedure

The parties already aware of the lengthy procedural history in this action, what follows is an abridged version of that history which focuses on information relevant to the motion. Plaintiff Rockwell classifies itself as the world's largest firm that makes and sells a large number of products for various uses in industrial automation systems.  Complaint, ECF Doc. 140: ¶5.  Safety and reliability of these products and their parts are of paramount importance not only to customers, but to Rockwell as a manufacturer to minimize quality problems and/or products liability claims.  All of Rockwell's products bear one or more of its U.S. registered trademarks,[4] which Rockwell asserts are source identifiers to its U.S. customers of its strict warranty, quality control measures, and customer support for each product sold in the U.S.  *Id.*: ¶23-29.  To preserve its warranty and quality control, Rockwell sells its trademarked goods only through a contract-delimited supply chain of authorized distributors. *Id.*: ¶24. To become Rockwell-authorized, a distributor must obligate itself via an executed agreement with Rockwell NOT to sell Rockwell goods to "non-value-added resellers".  *Id.*: ¶28.  Specifically, Rockwell has created a closed and exclusive supply chain of its trademarked goods by obligating a vertical supply network of authorized distributors to sell Rockwell trademarked goods ONLY to those customers who will NOT re-sell the goods on the gray market.  *Id.*  Thus, only authorized distributors may sell Rockwell's goods to only  those purchasers who must forego re-sale in unauthorized markets.

On 6 July 2015, Rockwell initiated this action against defendant Radwell.  On 16

---

[4] Rockwell owns twelve trademarks at issue in this matter.  All of which pertain to either its Allen-Bradley or Rockwell Automation, or other products and all are registered on the Principal Register of the U.S. Patent and Trademark Office.

February 2016, it filed a first amended complaint and on 28 March 2017 a second amended complaint, which is the complaint that controls here. The complaint has the following claims relevant to the motion: trademark infringement under 15 U.S.C. §1114 (Count I), false designation of origin under 15 U.S.C. § 1125(a)(1)(A) (Count III), and statutory unfair competition under N.J. Stat. Ann. §56:4-1 *et seq.* (Count V). It alleges Radwell has been selling in the United States certain products bearing Rockwell trademarks but which are unauthorized and unlawful gray goods. Complaint, ECF Doc. 140: ¶¶185-196. The complaint further alleges Radwell is not an authorized dealer of Rockwell goods in the U.S. Consequently, those goods Radwell has sold in the U.S. ["Radwell gray goods"] have been imported and/or sold in the U.S. without Rockwell's warranty, quality control and customer support and are therefore materially different from Rockwell U.S. goods. As unauthorized gray goods bearing Rockwell's trademarks, Radwell goods appear identical to Rockwell U.S. goods. However, Radwell gray goods lack the quality control, safety, warranty, and other quality benefits, which Rockwell alleges make Radwell goods inferior. *Id.* at ¶¶147-150. The complaint alleges the Radwell gray goods confuse the public as to their source and quality and thereby infringe Rockwell's trademarks and are consequently unlawful. *Id.* at 196-273.

Rockwell also alleges that it sells only to authorized dealers or in a very limited way directly to customers. *Id.* at least at ¶158. Further, Rockwell claims, in order to get around the barrier that Radwell was not an authorized U.S. distributor of Rockwell goods, Radwell committed fraud by creating a purchasing network of third party agents that bought Rockwell goods from Rockwell authorized distributors and sold them to Radwell. *Id.* at ¶¶151 – 174; ¶¶188-191. Thus, it is Rockwell's contention that its authorized distributors, intending to meet

their contractual obligations to Rockwell, nonetheless sold goods they did not know were intended for Radwell's ultimate purchase. *Id*. at ¶¶129 and 161. Radwell in turn re-sold the goods in the U.S. without authorization from Rockwell.

Rockwell alleges Radwell has deceived its authorized distributors to breach their distributorship agreements and/or received unauthorized Rockwell Products from unauthorized sources (*Id*. at ¶¶ 113-119, 205-206). Rockwell further alleges Radwell was only able to re-sell these products through a deceptive marketing scheme, largely through an internet site that advertises the products as "Radwell verified substitutes" for authorized Rockwell products. *Id*. at ¶¶123-127.

On 6 September 2017, Rockwell petitioned the International Trade Commission ["ITC"] to institute an investigation of several respondents including Radwell pursuant to 19 U.S.C. §1337 ["the investigation" or "§337 investigation"][5], In the ITC petition, Rockwell alleged the same claims as in the complaint. On 10 October 2017, the ITC instituted an investigation into Rockwell claims. On 21 November 2017, in response to Radwell's motion to stay the litigation, this Court ordered discovery in this matter stayed, pending the final resolution of the related ITC proceedings. ECF Doc. 278:2.

On 12 July 2018, Radwell voluntarily entered into a consent order stipulation with the ITC by which it agreed it would stop selling, importing, and selling for import any goods bearing Rockwell marks. On 20 July 2018, the ITC Administrative Law Judge ["ALJ"] issued an initial determination, which formally approved Radwell's consent stipulation, and which

---

[5] Such investigations aim to protect U.S. industry from harm by detecting and prohibiting the sale, the importation, or the sale-for-import of unlawful, i.e., infringing, goods.

constituted an ITC consent order and formally terminated the investigation as to Radwell.  On 15 August 2018, the ITC Commission in full accepted Radwell's consent stipulation; the ITC consent order became effective; and the stay of discovery (ECF Doc. 278:2) in this matter was terminated.

On 12 March 2019, Radwell filed this summary judgement motion (ECF Doc. 331); the opposition (ECF Doc. 350) and reply papers (ECF Doc. 369) were timely filed.

## 2.0    Parties Contentions

### 2.1    Defendant

Defendant Radwell's foremost argument is that, after the Supreme Court's ruling in *Lexmark*,[6] intellectual property ["IP"] rights have been held exhausted upon the first sale of the items covered by those rights, whether domestic or international, unless there is an express statutory exception to the contrary.   Further, Radwell argues, since the first sale doctrine applies to goods and services covered by registered trademarks and as the Lanham Act lacks an express exception to the first sale doctrine, the IP rights in the Rockwell goods sold in commerce inside or outside of the U.S. were necessarily exhausted under *Lexmark* upon Radwell's purchase of Rockwell-marked goods.   Moreover, lacking an express statutory exception to the first-sale doctrine, the Lanham Act can provide Rockwell no statutory basis to sue Radwell for trademark infringement and the ancillary counts depending on that infringement.   ECF Doc. 369: 2.

---

[6] *Impression Products, Inc. v. Lexmark International, Inc.*, 137 S.Ct. 1523, 198 L.Ed.2d 1 (2017) (Roberts, CJ) [holding that patentee had exhausted its patent rights on printer cartridges sold either domestically or internationally.

Radwell's argument relies on what it regards as the necessary inference of *Lexmark:* that the judge-made exception of "material differences" between the marked item sold or authorized by the mark owner and the gray good sold by a downstream marketer, even if unauthorized, is now without legal support.  In other words, Radwell contends *Lexmark* abolished the doctrine that the sale of  gray goods, even if "materially different"  from the goods authorized for sale in the U.S., necessarily creates consumer confusion as to the source of those goods.   It further contends that another Supreme Court case, *Kirtsaeng,*[7] involving the domestic and international exhaustion of copyrighted gray goods supports this interpretation.

The "material differences" doctrine, which is judge-made law, has been an exception to the doctrine that the first sale of a good covered by IP exhausts the IP owner rights in the good.  And it is this doctrine that Rockwell has relied on to base its trademark infringement and ancillary claims.  Radwell asserts that, since *Lexmark*, Rockwell cannot argue that its goods, sold in its approved marketing chain and bearing certain warranties of quality and safety, are "materially different" from the same Radwell goods, which lacked those warranties.

Radwell argues *Lexmark* did away with "the material differences" doctrine by asserting the first sale doctrine trumps every sale unless there is a statutory exception.  Therefore, the quality and safety assurances of Rockwell to its U.S. purchasers cannot, without a statutory exception in the Lanham Act, create a "materially different" good than a Radwell gray good, which lacks those warranties.   ECF Doc. 369:8.  Radwell argues, regardless of who sold the

---

[7] *Kirtsaeng v. John Wiley & Sons*, 568 U.S. 519,133 S.Ct. 135, 1185 L.Ed.2d 392 (2013) *holding* that the first sale doctrine, codified in the Copyright Act, and which provides that  an owner of a copy of a copyrighted work "lawfully made under this title" is entitled, without authority of the copyright owner, to sell that copy, **now also applies to copies lawfully made abroad** and *abrogating Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982 (9th Cir. 2008);  *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143 (9th Cir. 2013); and *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.*, 569 F. Supp. 47 (E.D.PA 1983).

Rockwell marked good in the U.S. and regardless of whatever assurances were or not attached to that good, the Rockwell's rights in those goods were exhausted whenever or wherever first sold, with or without the mark owner's authorization. Ultimately, Radwell argues *Lexmark* held an absolute exhaustion of IP rights after first sale applies, unless there is a statutory, not a judge-made, exception, which Radwell notes the Lanham Act lacks.

## 2.2    Plaintiff

Rockwell avers the Radwell gray goods were not authorized first sales that exhausted Rockwell's IP rights in the goods.  This is because of Radwell's fraud. Radwell lied to authorized dealers in order to buy these goods and then sold them without the warranties of quality, safety, and customer service that Rockwell required of its authorized distributors.  ECF Doc. 350: 1 and ECF Doc. 350-1:2.[8]  Rockwell therefore asserts the Radwell gray goods were not and could never be authorized sales of Rockwell goods but were instead "materially different" in their quality, safety, and replacement warranties, which Rockwell effected only for authorized goods sold in the U.S.  Put simply, having been bought outside of the U.S. for re-sale within the U.S., Radwell gray goods lacked Rockwell warranties.[9]  Nonetheless, the ultimate U.S. purchaser would very likely not know the Radwell gray goods lacked the Rockwell warranties, which would create consumer confusion as to the source of the goods, especially when it came time for the U.S. purchaser to request Rockwell's compliance with a warranty and was refused. ECF Doc. 350: 1.

---

[8] To be clear, authorized first sales are purchases of goods bearing Rockwell marks bought from authorized Rockwell distributors; these sales do invoke the first sale doctrine and exhaust Rockwell's IP rights in those goods.

[9] Rockwell would not recognize or honor those warranties for those goods even though sold in the U.S.

Consequently, Rockwell argues the Radwell gray goods were "materially different" from authorized U.S. goods in that being sold without Rockwell authorization in the U.S., they lacked the warranties of authorized U.S. goods. Because of these material differences, the Radwell gray goods cannot invoke the first sale doctrine, no matter how many times they were sold and re-sold in the United States. The "material differences" exception to the first sale doctrine for marked gray goods is set forth in long-standing judge-made law, impelled by the inevitable consumer confusion roused when gray goods materially differ from U.S. authorized goods. Ultimately, such consumer confusion is the hallmark of trademark infringement. *Id.* at 8-9.

Rockwell also contends Radwell is precluded under the doctrines of *res judicata*, collateral estoppel, and law of the case from asserting the defense that the first sale doctrine bars Rockwell's trademark infringement claim. Rockwell states Radwell has already raised and lost on this defense twice before. *Id.* at 6.

## 3.0   Legal Standards

## 3.1   Summary Judgment Generally

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the

case under governing law. *Id.*

The movant bears the initial burden of proof to present those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   If the movant makes this showing, the burden shifts to the non-moving party to offer evidence establishing the existence of a genuine dispute that compels a trial.   *Id.* at 324. Specifically, the non-movant "must set forth specific facts showing that there is a genuine issue for trial" ((*Fed. R. Civ. P.* 56(e); *Celotex*, 477 U.S. at 324)) through affidavits or otherwise as provided by Rule 56 and must "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir. 2002).  If the non-movant fails to do so, the Court must grant summary judgment. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992).  The evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. *Callahan v. AEV, Inc.,* 182 F.3d 237, 252 n. 11 (3d Cir.1999) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)).

In evaluating whether there is a genuine dispute of material fact, the Court considers all facts and ambiguities in the light most favorable to the non-moving party (*Anderson v. Liberty Lobby,* 477 U.S. 242, 255; *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir.2013)) and also draws all reasonable inferences in their favor.  (*Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 3d Cir.2011)).  However, the Court determines not "the truth of the matter," but whether a genuine dispute of material fact necessitates a trial. *Anderson,* 477 U.S. at 242; *Petruzzi's IGA Supermarkets,* 998 F.2d at 1230.  The Court therefore neither weighs the evidence nor makes

credibility determinations as these are tasks for the fact finder. *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.

A fact is material only if it can "affect the outcome of the suit under governing law" (*Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)). A material fact raises a genuine dispute "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988). Speculation, conclusory allegations, suspicions, or mere denials do not suffice to raise a genuine dispute of material fact. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-289 (3d Cir. 2018). Nor does reliance on the pleadings suffice, rather the non-moving party "must present affirmative evidence … from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 256.

When contradictory, material facts are presented, a genuine dispute is raised, which undercuts a decision for summary judgment. However, even with a presentation of contradictory facts, there can be no genuine dispute when one party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. When the movant has completely failed to show an essential element of its case, all other facts are immaterial. *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992).

**3.2** **"Material Differences" Exception to Exhaustion of IP Rights after a First Sale**

Although all Circuits that have considered the "material differences" exception in the

last twenty-five or thirty years have adopted it,[10] this discussion focuses on Third Circuit case law and on *Abbott Laboratories et al. v. Adelphia Supply USA et al.*, Civ. No. 15-5826 and 17-6002, 2019 WL 5696148 (E.D.N.Y. 30 Sep 2019). The Court considers *Abbott Labs* because it is the only federal case after *Lexmark* to offer a full exposition as why *Lexmark* in no way eroded the "material differences" doctrine.

*Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3d Cir. 1998) is the Third Circuit's defining case on the exception to the first sale doctrine because of "material differences" of unauthorized gray goods. The relevant procedural history in *Iberia* is that Iberia owned the valid, U.S. registered mark, Mistolin®, and sold Mistolin® products in the U.S. *Id.* at 300. Iberia had the Mistolin® goods manufactured under license by Caribe, a Puerto Rican entity. *Id.* at 301. Since Iberia was the sole distributor of Mistolin® products in the U.S., Caribe sent to Iberia the Mistolin® products it had made in Puerto Rico. *Id.*

Defendant Rol-Rom[11] bought products bearing the Mistolin® mark on the open market in Puerto Rico and sold them in New Jersey and New York in direct competition with Iberia. *Id.* at 300. Iberia sued for, among other things, trademark infringement, arguing Rol-Rom's sales of its gray goods in the U.S. market circumvented Iberia's quality control measures and that Rol-Rom's good were therefore not "genuine" Mistolin® products and injured the good will invested in the Mistolin® mark. *Id.*

Rol-Rom pushed back in a summary judgement motion, contending Puerto Rico is a United States territory and therefore the goods it sold were not gray goods as a U.S.

---

[10] *See* Plaintiff's listing of case law from almost all Circuits that espouse the material differences exception to first sale exhaustion of trademark rights for illegally imported or unauthorized gray goods. ECF Doc. 35:9.
[11] a New Jersey based distributor of household cleaning products

registration grants federal IP rights in U.S. territories. *Id.* Importantly for the present discussion, Rol-Rom also argued the first sale doctrine exhausted Iberia's IP rights because Iberia had not restricted Caribe's license to sales only to Iberia as mark owner. *Id.* at 301. Rol-Rom averred Iberia had granted Caribe a "naked license", which was unrestricted and which in effect gave Caribe the right to sell to any downstream entity regardless where the Mistolin® products were eventually marketed to the consumer. *Id.* Rol-Rom claimed the Mistolin® products it purchased from Caribe exhausted Iberia's IP rights in the products Rol-Rom imported and sold in the U.S.

The district court found summary judgement in favor of Iberia, holding that Rol-Rom's products were not "genuine" because they never passed through Iberia's post-manufacture quality controls; Rol-Rom appealed. *Id.* The Third Circuit reversed, finding Rol-Rom's products did not "materially differ" from Iberia's. Id. at 302. The Court declared the primary question on appeal was the "genuineness" of Rol-Rom's Mistolin® gray goods and then clarified throughout the rest of the opinion how a mark owner's imposition of quality control measures over the marked goods may or not create "material differences" as compared with allegedly infringing gray goods. *Id.*

The Third Circuit's reasoning is instructive here. It set forth that the "material differences" doctrine aims to determine whether the *marked* goods are non-genuine and therefore infringing and likely to injure the good will developed by the trademark owner in its goods. *Id.* at 302. "The test for whether an alleged infringer's products are genuine asks whether there are 'material differences' between the products sold by the trademark owner and those sold by the alleged infringer." *Id.* at 301-302 *citing See Société des Produits Nestlé,*

*S.A.  v. Casa Helvetia, Inc.*, 982 F.2d. 633, 638 (1st Cir. 1992); *Martin's Herend Imports, Inc. v. Diamond & Gem Trucking USA*, 112 F.3d 1296, 1303 (5th Cir.1997).  If there are no "material differences" between the owner's products and those of the alleged infringer, then the alleged infringer's are genuine and there is no trademark infringement under §32 of the Lanham Act. *Id*. at 302.  When a mark owner licenses another firm to make and mark its product, the mark owner may impose quality and inspection requirements on the licensed product in order to shore up and maintain consumer goodwill associated with its mark.  *Id.* Since such quality control requirements may create only subtle differences that may be difficult to measure, the test whether these quality demands imposed by the mark owner create "material differences" is whether they "are likely to result in differences between the products such that the consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill.  *See Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3,6 (2d Cir. 1996)." *Id*. at 304.

For the Third Circuit, the test to determine "material differences" especially as to quality control measures and procedures boils down to whether the quality differences of the allegedly infringing goods confuses consumers as to the source of the goods such that the good will in the mark is diminished.  *Id.*  Importantly, the *Iberia* Court looked to the First, Fifth, and Second Circuits for guidance in distinguishing "genuine" products and particularly, to the Second Circuit  in defining "material differences" as a function of the diminishment of the owner's mark.  The *Iberia* Court cited *Warner-Lambert*, 86 F.3d at 6 (2nd Cir. 1996) as support that the "trademark holder must show that it uses substantial and nonpretextual quality control procedures such that nonconforming sales will diminish the value of the mark".

*Id.*

There is currently no Third Circuit case directly on point for whether the Supreme Court's holdings in *Lexmark* and *Kirtsaeng* end the "material differences" judge-made doctrine for trademarks.   Nonetheless, *Abbott Laboratories v. Adelphia Supply USA*, Civ. Nos. 15-5826 and 17-6002, 2019 WL 5696148 (E.D.N.Y.  30 Sep 2019) is the single, *post-Lexmark* case that squarely decides this Supreme Court authority does not disturb the doctrine.  *Abbott* is instructive here because the Third Circuit has in the past relied on Second Circuit guidance to shape its own "material differences" jurisprudence.   *See Iberia*, 150 F.3d at 304.

 In answering  whether *Lexmark* and *Kirtsaeng* even considered the trademark infringement of gray goods, the *Abbott* court said, in a word, no.   It was "not persuaded that the principles enunciated in *Kirtsaeng* and *Impression Products [Lexmark]* disturb this Circuit's law on trademark infringement with respect to gray goods".  *Abbott*, 2019 WL 5696148, at *5.

In *Abbott*, plaintiff Abbott Labs made and sold FreeStyle® and FreeStyle Lite® blood glucose strips used worldwide by diabetics to monitor their blood sugar level.  *Id*. at *2.  The strips sold domestically were identical to those sold internationally, except for pricing and packaging.  *Id*.  The pricing disparity, in particular, fostered price arbitraging by downstream companies, which purchased the cheaper international strips abroad and imported them into the U.S as gray goods for sale at a higher price.  *Id*. at *3.  Abbott Labs had instituted several and distinct quality control measures for those blood glucose strips intended for sale in the U.S., which the international strips lacked.  Abbott Labs controlled these measures[12] strictly,

---

[12] These included: 1) the domestic package bore an NDC number on the front and bottom of the box, which the international packages lacked.  Thus, the domestic package could be easily identified in a recall.   2) the domestic package contained several warnings and instructions about using the strip; the international box contained instructions that the U.S. Food and Drug

diligently, persistently, and unequivocally.  *Id.*

While recognizing "the first sale doctrine is deeply rooted in common law" with "applications in copyright, patent, and trademark law", the *Abbott* Court reasoned that different IP applications serve different public interest purposes.  *Id*. at *5.  It revisited relevant "material differences" case law from different Circuits to work through whether *Kirtsaeng* on copyright exhaustion and *Lexmark* on patent exhaustion now control or could control on trademark infringement of gray goods. *Id*. at *4-5.   From this review, the *Abbott* Court formulated the singular proposition that a trademark is not about giving a duration-limited IP right, such as a copyright and a patent (*Id*. at *5) but kept returning to the uniqueness of trademarks as a source identifier and brand creator that consumers can count on **for as long as** the mark is used in commerce.   *Id.*

Its case law review revealed to the *Abbott* Court the fundamental proposition that "materially different" goods not intended for domestic sale may give rise to Lanham Act liability because they are not considered "genuine, under the so-called 'first-sale doctrine' [citations omitted]".  *Id.*   This formulation arose especially from the *Abbott* Court's reliance on the bedrock case, *Société des Produits Nestlé, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 638 (1st Cir. 1992), from which much of the "material differences" law of the Circuits, including the Third's, flows.  *Id.*

The *Abbott* Court characterized *Société des Produits Nestlé* as standing for the following:

" the maxim that trademark law does not prohibit 'the sale of genuine goods

Administration had explicitly rejected; 3) the domestic package listed a U.S. toll-free customer-help phone number, while the international packages listed international numbers.  *Abbott*, 2019 WL 5696148, at *3.

bearing a true mark even though such sale is without the mark owner's consent' is **inapplicable** 'when genuine, but **unauthorized**, imports differ materially from authentic goods authorized for sale in the domestic market'—rather, 'an unauthorized importation may well turn an otherwise *genuine* product into a *counterfeit* one.' " *Abbott*, 2019 WL 5696148, at *5 [emphasis added].

In essence, the *Abbott* Court's reliance stems from:

> " the unauthorized importation and sale of materially different merchandise violates Lanham Trade–Mark Act section 32 because a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill". *Société des Produits Nestlé*, 982 F.2d at 638.

To the point, the *Nestlé* Court had specified that unauthorized importation occurs not because of "the registrant's consent to a third party's use of the mark abroad **but [because of] the registrant's consent (or lack thereof) to the defendant's sale of the gray good in the domestic market.** *See Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.,* 816 F.2d 68, 73 (2d Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987)" [emphasis added]. *Abbott*, 2019 WL 5696148, at *5.

In summary, the *Abbott* Court found support neither from the *Lexmark/Kirtsaeng* holdings nor from the application of them to the judge-made law of the Second, or any other, Circuit for an abolition of the "material differences" doctrine of marked, gray goods.

Because of the thorough-going reviews of the "material differences" exception to the first sale doctrine in *Iberia* and *Abbott* and given that neither *Lexmark* nor *Kirtsaeng* raised or had reason to even consider the "material exception" doctrine as applied to trademarks, this Court relies on Third Circuit reasoning in *Iberia* and on the relevant considerations in *Abbott* for the continued relevance and applicability of the "material differences" doctrine to the motion here.

As a parting thought whether *Lexmark/Kirtsaeng* holdings could ever vitiate "material differences" jurisprudence, this Court finds informative and controlling the Supreme Court's recent characterization of a trademark's purpose:

> " A trademark 'designate[s] the goods as the product of a particular trader' and 'protect[s] his good will against the sale of another's product as his.' *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); see also *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412–413, 36 S.Ct. 357, 60 L.Ed. 713 (1916). It helps consumers identify goods and services that they wish to purchase, as well as those they want to avoid. *See Wal–Mart Stores, supra,* at 212–213, 120 S.Ct. 1339; *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ". *Matal v. Tam,*582 U.S.___, 137 S.Ct. 1744,198 L.Ed.2d 366 (2017).

As the *Abbott* Court observed, "the Supreme Court has long recognized the 'historic kinship between patent law and copyright law', but the Supreme Court itself has "consistently rejected the proposition that a similar kinship exists between copyright law and trademark law. *Sony Corp. of Am.v. Universal City Studios, Inc.*, 464 U.S. 417, 439 & n. 19 (1984)". *Abbott*, 2019 WL 5696148, at *5. And, based on the Supreme Court's recent comments in *Tam* above, this Court likewise rejects the proposition that a similar kinship exists between patent law and trademark law.

## 4.0    Discussion

### 4.1    Jurisdiction and Venue

The Court has subject matter jurisdiction over this action pursuant to the federal statute governing trademarks at *15 U.S.C. §1121* as well as general personal jurisdiction because defendant Radwell's headquarters are in New Jersey. Pursuant to *28 U.S.C. §1391(b)(1)*, venue is also proper based on the location of Radwell headquarters.

## 4.2 Application of the "Material Differences" Doctrine to the Facts Asserted Here

Radwell does not seek a ruling regarding whether the facts are in dispute here.  In fact, Radwell does not dispute it sold gray goods into the United States that bore identical marks as those on Rockwell's machines and machine parts authorized for sale in the United States.  Nor does it dispute its gray goods lacked the same warranties of quality, safety and replacement as Rockwell's U.S. authorized goods.  What Radwell does dispute is the application of the first sale doctrine to gray goods.   Specifically, Radwell seeks this Court's death knell to the "material differences" judge-made exception that exhaustion of rights is inapplicable to the first sale of unauthorized gray goods.  In arguing its interpretation of how a recent Supreme Court case involving patented goods changed the law on trademark infringement,  Radwell seeks a new, unprecedented application of the first sale doctrine for gray goods covered by trademarks.

In a summary judgement motion, that's a tall order.  The Court notes Radwell's recurring argumentation[13,14] that exhaustion based on the first sale doctrine is an absolute defense to trademark infringement.  Those arguments would hold true, if not for the "material differences" jurisprudence that excludes unauthorized gray goods from the first sale doctrine, which this Court expressly holds is alive and well as discussed in the previous section.  Said

---

[13] In its motion to dismiss ["MTD"] brief under FRCP 12(b)(6) [ECF Doc. 72-2:15-23], Radwell asserted Rockwell had insufficiently pleaded the Rockwell goods were materially different from the Radwell gray goods.

[14] In Motion Docket No. 1074-017 in a 337 proceeding before the International Trade Commission at *Certain Industrial Automation Systems*, USITC Inv. No. 337-TA-1074, Radwell also presented a similar argument as made here that *Lexmark* vitiated the material differences exception to the exhaustion doctrine. The ITC Administrative Law Judge declined to accept the argument, stating "Radwell has not demonstrated that these decisions [referring expressly to *Lexmark* and *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013)] defeat Rockwell's gray market allegations as a matter of law".   She also noted the ITC legal "[s]taff says that the first sale bar applies under trademark law but that the judicial exception for material differences is well-established in the circuits, including in the Federal Circuit" [which governs appeals of ITC decisions].  *Certain Industrial Automation Systems*, USITC Order No. 27, Inv. No. 337-TA-107 (30 May 2018).

directly, this Court finds Radwell's claim that *Lexmark* exerts an all-inclusive command over the exhaustion of the first sale of goods covered by IP to be just wrong. This Court confirms with the *Abbott* Court that the "material differences" jurisprudence was not disturbed by *Lexmark* or *Kirtsaeng*.

With the confirmation that the "material differences" judge-made law persists to except unauthorized gray goods from the first sale doctrine, what remains in this motion is a check of whether material facts are in genuine dispute. The Court finds two material facts disputed in the parties' arguments.

First, Radwell asserts there can be no "material differences" between the gray goods it sells in the U.S. and Rockwell's U.S. goods because that judge-made exception is legally dead. Rockwell counters Radwell's goods in the U.S. are in fact "materially different" from Rockwell's U.S. goods and for that reason, Radwell infringed Rockwell's marks. Second, the "material differences" of Radwell's goods arises from its selling those goods as an unauthorized Rockwell distributor in the U.S. Radwell neither admits nor denies its status as an authorized distributor, whereas Rockwell asserts Radwell is not authorized.

Given the continued good health of the "material differences" doctrine, whether Radwell is an authorized distributor of Rockwell goods sold in the U.S. is a question at the heart of the trademark infringement and ancillary counts. Under Third Circuit standards, these disputed facts must be reserved for the fact finder, which means on balance Radwell's motion fails.

Finally, the Court acknowledges Rockwell's contentions that Radwell's arguments regarding the "material differences" exception are barred by legal estoppel given that Radwell

has pursued these before and they have been settled in a manner as here, that is, by sustaining the vigor of the "material differences" exception.[15]  A discussion of the legal estoppel arising from Radwell's other instances would involve explaining the difference between the MTD and the summary judgment standard as well as the difference in standards before this Court and an administrative agency.[16]   The Court foregoes such a discussion as beyond the needs of resolving this motion but appreciates Rockwell's alert.  Moreover, the Court hopes its reasoning above is sufficiently clear to leave Radwell persuaded not to call forth again its incorrect reading of *Lexmark* and *Kirtsaeng*.

For the reasons discussed above, the motion for summary judgment is DENIED.


Dated:  30 December 2019                                        s/ Robert B. Kugler
                                                               ROBERT B. KUGLER
                                                               United States District Court Judge

---

[15] *See supra* notes 10 and 11 for how Radwell previously argued this point before this Court and the ITC.
[16] which may well involve explaining the application of the Administrative Procedure Act