**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| _____ | ) | |
| Rockwell Automation, Inc. | ) | |
| Plaintiff, | ) | Civil No. 15-05246 (RBK/JS) |
| v. | ) | |
| | ) | **Opinion** |
| Radwell International, Inc., | ) | |
| Defendant. | ) | |
| _____ | ) | |

**KUGLER**, United States District Court Judge

Before the Court in this action concerning, among other things, trademark infringement, are two summary judgment motions under Federal Rule of Civil Procedure ["Fed. R. Civ. Proc.", "FRCP", or "Rule"] 56 (a) one from plaintiff Rockwell Automation ["Rockwell"] ["plaintiff's motion"] (ECF Doc. 526 and Docs. 530 through 534) and one from defendant Radwell International, Inc. ["Radwell"] ["defendant's motion"] (ECF Doc. 527 and Docs.528-529).

Plaintiff Rockwell is a 100 year-old company that manufactures electronic controllers (the brains of assembly lines), various motors (the muscle of assembly lines), and various input/output devices for assembly lines, which industrial automation equipment is used in such different applications as amusement parks to auto assembly lines to pharmaceutical companies.  Rockwell also sells products and solutions in connection with and to support its industrial automation systems.   Rockwell's business hinges on the quality of its products and solutions.

Defendant Radwell is a very large provider of new and used surplus, industrial electrical and electronic control equipment by buying new and used controls from plant closings, auctions and inventory overstock.  It certifies the parts, ships them in custom Radwell packaging, and sells them for half of their original price. Radwell also sells 30% of its products outside the United States. Specifically, for this matter, Radwell purchases and resells Programmable Logic Circuits, including those manufactured by plaintiff.

Plaintiff's motion seeks summary judgment on Counts I, II, VII and VIII, of its second amended complaint ["the complaint"] (ECF Doc. 140) and against all of Radwell's Counterclaims I through V in order to dismiss them.  (S*ee* ECF Doc. 222, Radwell's Second Amended Answer and Amended Counterclaims).

Defendant's motion (ECF Doc. 527) seeks summary judgment on Counts I, III, V, VII, VIII and X and

Defendant's memorandum of law (ECF Doc. 528) also seeks summary judgment on Count VI.

Relevant to the complaint, there were originally 10 counts, one has been dismissed[1] and of the remaining nine, one count is not at issue here:  Count IX, aiding and abetting fraud.

The seven counts from the complaint at issue in these motions are:

Count I, trademark infringement, Lanham Act, 15 U.S.C. §1114 (plaintiff's and defendant's motions);

Count II, false advertising, Lanham Act, 15 U.S.C. §1125(a) (1) (B) (plaintiff's motion);

Count III, false designation of origin, Lanham Act, 15 U.S.C. §125(a) (1) (A) (defendant's motion);

Count V, statutory unfair competition, N.J. Stat. Ann. § 56:4-1 *et seq.* (defendant's motion);

Count VII, tortious interference with contract (plaintiff's and defendant's motions);

Count VIII, aiding and abetting tortious interference with contract (plaintiff's and defendant's motion); and Count X, unjust enrichment (defendant's motion).

Relative to Radwell's counterclaims (ECF Doc. 222), all five are at issue here:

First, conspiracy in restraint of trade and commerce under Sherman Act 1, 15 U.S.C. § 1;

Second, conspiracy to monopolize and monopolization under Sherman Act 2, 15 U.S.C. §2;

Third, tortious interference with contract;

Fourth, tortious interference with prospective economic advantage; and

Fifth, specific state antitrust/consumer protection statutes under:

California Cartwright Act, California Business and Professions Code § 16720 *et seq.*;

Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.*;

Maine Monopolies and Profiteering Law, 10 M.R.S. § 1101 *et seq.*;

Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*;

Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-.66;

Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

North Dakota Uniform Antitrust Act, North Dakota Century Code § 51-08.1-01 *et seq.*;

New Mexico Antitrust Act, NMSA 57-1-1 to -15;

New York Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*;

South Dakota Codified Laws § 37-1-3.1 *et seq.*;

Vermont Consumer Protection Act, 9 V.S.A § 2451 *et seq.*; and

Wisconsin. Stat. Ann. §§ 133.01-.18.

As these motions for and against the complaint counts and against the counterclaims are interrelated and seek opposing rulings on the same issues of law and a similar set of material facts, the Court takes up both parties' motions in this opinion.

---

[1] Count IV of the complaint for trademark dilution under the Lanham Act, 15 U.S.C. §1125(c) was dismissed by the Court in *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, No. 15-cv--5246 (RBK/JS), 2016 WL 7018531 (D.N.J. 30 Nov 2016).

Table 1 shows the specific summary judgment requests from plaintiff and defendant.

**Table 1**

| Complaint Count | Law Pleaded | P Requested ECF Doc.  526 | D Requested ECF Doc. 527 |
|---|---|---|---|
| I:  Trademark Infringement | Federal | Grant | Denial |
| II: False Advertising | Federal | Grant | |
| III: False Designation of Origin | | | Denial Not briefed separately but in combination with Counts I, V, and VI |
| V:  Unfair Competition | NJ Statute | | Grant Not briefed separately but in combination with Counts I, III, and VI |
| VI. Common Law Unfair Competition | | | Grant Not briefed separately but in combination with Counts I, III, and V |
| VII: Tortious Interference ["TI'] with Contract | State | Grant | Denial |
| VIII:  Aiding / Abetting TI with Contract | State | Grant | Denial |
| X. Unjust Enrichment | State | | Denial |
| | | | |
| **Counterclaim**  (ECF Doc. 222) | **Law Pleaded** | **P Requested ECF Doc.  526** | |
| 1. Conspiracy of Restraint of Trade and Commerce | Federal | Grant to Dismiss | |
| 2.Conspiracy to Monopolize and Monopolization | Federal | Grant to Dismiss | |
| 3.Tortious Interference["TI"]  with Contract | State | Grant to Dismiss | |
| 4. TI with Prospective Economic Advantage | State | Grant to Dismiss | |
| 5.State antitrust | State Statutory | Denial | |

**The COURT HAVING REVIEWED** the parties' submissions (without a hearing in accordance with Rule 78.1 (b)) and for the reasons below, and for good cause shown,

As to Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability, **DENIES** defendant's Motion for Summary Judgment, and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count II (False Advertising), the Court **GRANTS** plaintiff's Motion for Summary Judgment

on liability and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count III (False Designation of Origin), the Court **DENIES** defendant's Summary Judgment Motion;

As to Counts V and VI (State and Common Law Unfair Competition), the Court **DENIES** defendant's Motion for Summary Judgment;

As to Counts VII and VIII (Tortious Inference with Contract and Aiding and Abetting Such), the Court **DENIES** the Motions for Summary Judgment of plaintiff and defendant;

As to Count X (Unjust Enrichment), the Court **GRANTS** defendant's Motion for Summary Judgment Motion and enters Judgment in favor of Defendant and against Plaintiff on this Count; and

As to Counterclaims I through VI (Sherman Act §§1 and 2, Tortious Inference with Contract and with Prospective Advantage, and State Law Antitrust), the Court **GRANTS** plaintiff's Motion for Summary Judgment and Judgment is entered in favor of Plaintiff and against Defendant on all of the Counterclaims.

For the following issues, a jury trial remains and will be scheduled in due course: Plaintiff's damages for defendant's liability for trademark infringement and false advertising; Whether defendant is liable for state law and common law unfair competition (Counts V and VI); Whether defendant is liable for tortious interference with plaintiff's contracts and for aiding and abetting such tortious interference (Counts VII and VIII).

An appropriate Order of this date accompanies this Opinion.

## 1.0   Background and Procedure

There is a lengthy procedural history of this matter.  The recounting below focuses on information relevant to the pending summary judgment motions.

To avoid ambiguity, here are the Court's definitions for several terms:

As used herein, a " 'bare' reseller" refers to an entity that buys from one of plaintiff's Authorized Distributors ["AD"] a Programmable Logic Circuit ["PLC"], which is a solid-state, electronic device that operates a machine within a factory assembly line or other industrial setting through software logic programmed into its memory and includes a Central Processing Unit ("CPU"), memory caches, and circuits to receive input and output data.   The "bare" reseller then re-sells the PLC without installing it into a factory installation, machine set-up, panel, or into a machine system.  In other words, such a reseller does NOT add value, either in terms of technological solution or know-how.

As used herein, a "value-added reseller" or "VAR" refers to an entity that inserts the PLC into a ready-made pre-fab installation or designs an installation into which the PLC will articulate, or builds a machine panel for housing the PLC.  All ways a VAR may articulate a PLC into an installation are contemplated here, even if not expressed.

As used herein, Rockwell's "customers" refers to VARs.  This is how Rockwell regards VARs in their distribution chain, as discussed *infra* in detail.

As used herein, "end-user" refers to the entity that engages a VAR to perform a service that may include designing and/or building a factory installation or entire factory or a machine part or a control panel, e.g., a fuse box or an area where controls for an automated part are accessible as a technological innovation or the design plus PLC as know-how that the end-user buys from the VAR. ECF Doc. 140 (the Complaint) ¶28.

As used herein, "consumer" can have two uses.  When used as a generic term in this matter, "consumer" can have various legal meanings. For example, when used in consumer protection statutes, such as the Lanham Act, the statutory definitions of 'consumer' have common core features, which include: private individual or a sole proprietorship or a partnership acquiring goods or services, for whom the statute is protecting against unfair trade or deception by the purveyor.[2]

When  used  in a more specific way that relates to this matter, "consumer" refers to a theoretical individual member of the public that is presumed knowledgeable and discriminating enough about PLCs to understand distinctions among different brands of PLCs on the U.S. market so as to be capable of rationally choosing one PLC over the other.  Typically, such individuals may include some employees of VARs, direct corporate purchasers, designers of factory installations, manufacturers of PLCs, as well as some employees of the end-users requesting VARs to build installations, panels, machines, and factories for them.

As used herein, there is an important distinction between "customer" and "consumer". "Customer" specifically refers to a Rockwell customer, which for 95% of Rockwell sales is a VAR and for 5% of which is a corporate entity purchasing directly from Rockwell itself.   ECF Doc. 528:9-10 (Radwell Summary Judgment Motion); ECF Doc. 635:6 (Radwell Reply in Support of its Summary Judgment Motion).[3]  In a specific use as described above, a "consumer" as opposed to a "customer" may refer to an "end-user", whereas a "customer" is not an "end-user".

 Plaintiff Rockwell classifies itself as the world's largest firm that makes and sells a large number of products for various uses in industrial automation systems.  Complaint, ECF Doc. 140 ¶5.  These

---

[2] *See* Black's Law Dictionary, (11th ed. 2019).
[3] See also, ECF Doc. 530-3 (Declaration of Paul Tanck) Exhibit 20:34-52 (Transcript of Deposition [FRCP 30(b)(6)] of Rodney Michael, 28 March 2018)  testifying in the 1074 ITC Investigation as to the percentages of sales each kind of VAR makes.

products include industrial manufacturing controls, equipment condition monitors, system sensors, safety components, and programmable controllers, especially Allen-Bradley-branded Programmable Logic Circuits ["PLCs"][4].   Since these products control all manner of automated systems, their overall safety and reliability, as well as that of their individual parts, are of paramount importance not only to customers and consumers, but also to Rockwell as a manufacturer to minimize quality problems and products liability claims. All of Rockwell's products bear one or more of its U.S. registered trademarks,[5] which Rockwell asserts are source identifiers to its U.S. customers of its warranty, quality control measures, and customer support for each product sold in the U.S.  *Id.* ¶¶23-29.

To preserve its warranty and quality control, Rockwell sells its trademarked goods in the U.S. only through a contract-delimited supply chain of Authorized Distributors ["ADs"]. *Id.* ¶24.  This agreement is the Allen-Bradley Automation Distributor Agreement ["AD agreement"].  ECF Doc. 531-3 (Declaration of Paul Tanck), Exhibit 27.  To become Rockwell-authorized, a distributor must obligate itself via the AD agreement with Rockwell NOT to sell Rockwell goods to "bare" resellers, but only to value-added resellers ["VARs"].  In other words, ADs must obligate themselves to sell Rockwell PLCs only to those VARs who have contracted with Rockwell or pledged not to engage in "bare" reselling.

Moreover, Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of ADs to sell Rockwell trademarked goods ONLY to those customers who will NOT re-sell the goods on the gray market.  Complaint, ECF Doc. 140 ¶24.  Thus, only ADs may sell Rockwell's goods to only a VAR that must forego re-sale of bare PLCs.  From the perspective of its business strategy of creating a closed distribution chain, Rockwell defines VARs as those entities that sell its PLCs only as part of an installation or assembly, thus selling a value add and not just the PLC.

On 6 July 2015, Rockwell initiated this action against defendant Radwell and on 16 February 2016, filed a first amended complaint.   In response to Radwell's motion to dismiss, on 30 November 2016, the Court dismissed count IV of the complaint.[6]  On 28 March 2017, Rockwell filed a second amended complaint, which is the controlling complaint here.  On 27 June 2017, Radwell filed an amended answer and its counterclaims.  ECF Doc. 222.

---

[4] A PLC is a solid-state, electronic device that operates a machine within a factory assembly line or other industrial setting through software logic programmed into its memory and includes a Central Processing Unit ("CPU"), memory caches, and circuits to receive input and output data. It operates machinery by continually scanning the software to determine if and when pre-programmed input conditions of the machine are met. Once input status indicates a start event should occur, the PLC executes the operation software of the machine to perform a function, and then updates output status of that performance.
[5] Rockwell owns twelve, in force trademark registrations at issue on the Principal Register of the U.S. Patent and Trademark Office ["USPTO"].   The marks brand Rockwell products as ALLEN-BRADLEY®, A-B®, ROCKWELL AUTOMATION®, and/or CONTROLLOGIX®.
[6] *See supra* note 1.

On 15 August 2017, Rockwell filed a motion to dismiss the counterclaims (ECF Doc. 281) and on 6 September 2017, petitioned the ITC to institute an investigation of several respondents including Radwell pursuant to 19 U.S.C. §1337.[7]  In the ITC petition, Rockwell alleged a similar trademark infringement count as in the complaint, but asserted different legal arguments for the unfair competition count and did not plead the other Lanham Act complaint counts for False Advertising and Designation of Origin.

On 10 October 2017, the ITC instituted Investigation No. 337-TA-1074 ["ITC 1074 investigation"] into Rockwell's claims. On 25 October 2017, Radwell sought a mandatory stay under 28 U.S.C. §1659 of all pending counts in the complaint in this action for the duration of the ITC 1074 investigation (ECF Doc. 255), which Rockwell countermanded with a request for a discretionary stay of all the complaint counts and of all counterclaims.  ECF Doc. 261.  On 21 November 2017, this Court granted Rockwell's motion for a discretionary stay of all counts and the counterclaims and ordered discovery in this matter stayed, pending final resolution of the ITC 1074 investigation.  This meant all pending motions before the Court, including Rockwell's motion to dismiss the counterclaims, were terminated without prejudice.  ECF Doc. 278.

On 12 July 2018, in the ITC 1074 Investigation, Radwell voluntarily entered into a consent order stipulation with the ITC, by which it agreed it would stop selling, importing, and selling for import any goods bearing Rockwell marks. On 15 August 2018, the ITC Commission in full accepted Radwell's consent stipulation, thereby making the ITC consent order effective.

During the pendency of the ITC 1074 investigation, on 29 March 2018, Radwell sought to institute its own ITC investigation, No. 337-TA-1105 ["ITC 1105 investigation'"].  Radwell claimed Rockwell's AD network harmed the U.S. PLC industry by ultimately reducing competition in the U.S. PLC market.  Radwell claimed Rockwell's vertical distribution system boycotted PLC resellers in the U.S. from gaining access to Rockwell PLCs and fixed the prices of Rockwell PLCs.  These activities together stopped other PLC resellers from gaining access to Rockwell PLCs at a discounted price, which ultimately meant they could not gain revenue by selling PLCs in the U.S. at a discounted price.  About

---

[7] Section 332 with Section 337 of the Tariff Act of 1930 authorizes the ITC to perform investigations into the unlawful importation, sale, or sale for importation into the United States of articles that infringe a valid, enforceable U.S. registered trademark.  *19 U.S.C. §1332 and §1337(a)(1)(C)*.

§337 investigations aim to prevent, investigate and redress unfair practices in import trade (*19 U.S.C. §1337*) and provide a venue other than federal courts for trademark owners seeking to redress trademark infringement and unfair competition.  Not an Article III court but a quasi-adjudicative administrative agency, the ITC follows its own procedural rules, codified in the Federal Regulations ["CFR" or "Regulations"] largely at 19 C.F.R.§201.16 and part 210.

The ITC has the authority  to grant the following remedies: exclusion orders of importing and selling (against parties); temporary limited exclusion orders (during the investigation); cease and desist orders; and temporary cease and desist orders (*19 U.S.C. 1337(d) – (g)*),  but cannot authorize damages, which can be granted in concurrent federal court filings   Joseph H. Heckendorn *et al.*, *Gray Market Trademark Infringement Actions at the U.S. International Trade Commission: The Benefits of the Forum and Analysis of Relevant Cases*, 8 J. MARSHAL REV. INTELL. PROP. L. 271, 273 & 277-278 (2009).

six months later on 8 November 2018, Radwell filed an opposed motion to terminate the 1105 investigation, which the ALJ granted and the Commission affirmed on 14 December 2018, thereby terminated the 1105 investigation.[8]  The stay of discovery under ECF Doc. 278 had also extended to the ITC 1055 investigation.

On February 25, 2019, the Court lifted that stay.  ECF Docs. 302 & 320.  On 25 April 2019, the Court ordered the transfer of the entire record from both the ITC 1074 and 1055 Investigations to this Court.  ECF Doc. 388.

Filing a summary judgment motion on 22 Feb 2019 (ECF Doc. 314), Rockwell argued the voluntary consent order between Radwell and the ITC (which stopped Radwell's importation of Rockwell PLCs into the U.S.) worked *res judicata* to bar the same claims[9] raised before the ITC from being litigated in this Court.  On 26 September 2019, this Court denied that motion, holding a voluntary consent order executed with the ITC BEFORE an ITC initial determination was not an adjudicated decision that resolved legal issues and therefore cannot preclude litigating those same issues in this Court.  ECF Doc. 551.

On 12 March 2019, Radwell filed a summary judgment motion (ECF Doc. 331) arguing certain Supreme Court cases (involving patents and copyrights) ended the judge-made exception that material differences between U.S.-sold marked goods and imported gray goods no longer grounded trademark infringement against the gray goods seller.  In denying that motion on 30 December 2019, this Court held the material differences jurisprudence of trademark infringement was alive and well in U.S. federal courts, and therefore justified a ruling of trademark infringement when unauthorized, marked goods were sold in the U.S. (either imported as gray goods into the U.S. or as goods acquired in the U.S.). ECF Doc. 470.  This holding meant plaintiff's counts alleging defendant's trademark infringement under the Lanham Act remained in this action.

On 16 Dec 2019, plaintiff filed the summary judgment motion at issue here (ECF Doc.  526) in favor of its counts listed above and seeking dismissal of Radwell's counterclaims.  On the same day, defendant filed its summary judgment motion at issue here (ECF Doc. 527) seeking dismissal of plaintiff's counts I, III, V, VII, VIII and X. Oppositions and replies were timely filed.

---

[8] U.S. International Trade Commission Notice regarding Termination of Investigation No. 337-TA-1105 re Certain Programmable Logic Controller (PLCs), Components Thereof, and Products Containing Same, 83 Federal Register 249 (31 December 2018).
[9] The counts at issue before the ITC were:  I Trademark Infringement; V Statutory Unfair Competition under N.J. law; VII Tortious Interference with Contract; VII Aiding / betting with Tortious Interference with Contract; IX Aiding /Abetting Fraud.

**2.0      Parties' Contentions**

**Rockwell**

In the complaint, Rockwell alleges under the Lanham Act: Radwell's trademark infringement (15 U.S.C. §1114), false advertising (§1125(a)(1)(B)), and false designation of origin (15 U.S.C. §125(a)(1)(A)).  At the heart of Rockwell's complaint is the allegation that Radwell has been selling in the U.S. unauthorized Rockwell-branded products that, although identical in appearance, mark, and brand, are materially different from those Rockwell sells in the U.S. and thus create consumer confusion as to the source of the goods.

As used herein, the term "Radwell goods" refers to Rockwell-branded PLCs that Radwell sells in the U.S.  To be clear, Radwell goods are either gray goods that Radwell purchased overseas and imported into the U.S. or alternatively purchased in the U.S. either from a Rockwell AD or a VAR who itself acquired the PLC from an AD.  Rockwell alleges that Radwell could acquire PLCs in the U.S. only by misrepresenting itself to an AD as a value-added reseller or having an agent or a third party act on its behalf to so misrepresent.  Complaint, ECF Doc. 140 ¶¶185-196.

Rockwell alleges Radwell goods are infringing because, although Radwell U.S. goods appear identical to Rockwell-branded U.S. goods, Radwell goods lack Rockwell's warranty, quality control and customer support guarantees.  They are therefore materially different from Rockwell's and thereby cause inevitable, inescapable consumer confusion when a purchaser of a Radwell U.S. good expects Rockwell to honor a warranty the Radwell good lacks.  *Id.* ¶¶147-150.  Specifically, the complaint alleges Radwell goods confuse the public as to their source and quality.  *Id.*¶¶ 196-273.

To ensure that only its authorized goods—that is, those with warranties and customer service extras—are sold in the U.S., Rockwell has delimited distribution of its U.S. goods by creating a network of ADs that are, besides itself, the exclusive suppliers of its U.S. goods. To execute on this strategy, Rockwell alleges it sells its U.S. products only to authorized dealers or, in a very limited way, it sells directly to customers.  *Id.* at least at ¶158.

Rockwell asserts it established its AD network through executed agreements in which each AD promises not to sell Rockwell products to a reseller (for the purposes of this opinion, that means a "bare" reseller.  *See* the definition *supra*) in the U.S.  *Id.* ¶43.  Said differently, Rockwell created a closed vertical distribution chain of its products via exclusive dealing contracts with its ADs. The Rockwell AD network functions this way:  Rockwell assigns a specific territory in the U.S. to each of its ADs.  In selling to its ADs, Rockwell discounts its prices and extends warranties and other product add-ons to the ADs through credit rebates.  Although the AD agreements do not prohibit an AD from selling to a customer outside its assigned territory, Rockwell does not extend a credit rebate for such sales so that the AD

does not realize as much profit if selling outside its territory as within.  This practice disincentivizes encroachment on another ADs territory, and inhibits competition among ADs competing with each other for the same customer base), but does not prohibit it.  Doc. 642-4:3 (Rockwell's Response to Radwell's Statement of Disputed Material Facts) [citing ECF Doc. 590, Ex. 60 (Rodney Michael Rebuttal Witness Statement in the ITC 1055 investigation) at Q55-56].

In authorizing ONLY a contractually-obligated distributor to sell its branded products, Rockwell offers differing credit rebates to its ADs depending on which class of customer—certain kinds of VARs vs an end-user— the AD is selling to.  In turn, the AD can offer differing price points to different classes of customers to ensure a required level of revenue for itself and ultimately to Rockwell and build loyalty of the VARs as customers to ensure repeat sales. Thus, Rockwell and its ADs practice some form of third-degree price discrimination throughout Rockwell's vertical chain distribution, whereby different kinds of consumers—whether one of the 4 kinds of VARs or an end-user—pay higher or lower prices for the same good.  Complaint, ECF Doc. 140 ¶88; ¶¶147-148.

Rockwell asserts Radwell is not an authorized dealer of Rockwell goods in the U.S; which Radwell does not dispute.  Because of that, Rockwell asserts Radwell goods necessarily lack the quality control, safety, warranty, and other quality benefits of AD-sold Rockwell goods, which make Radwell goods inferior and confuse the consumer as to source. *Id*.¶¶ 1, 5.

Rockwell further claims, in order to break into its closed vertical network of ADs, Radwell committed fraud by engaging third party agents--allegedly some who posed as VARs to Rockwell--that bought from ADs and sold to Radwell for Radwell's resale in the U.S.  *Id*. ¶¶151 – 174; ¶¶188-191.  S*ee also Id*.¶¶28-29 discussing that not only are ADs obligated not to sell to re-sellers, but the entities termed Value-Added Resellers ["VARs"] either obligate themselves formally or negotiate an informal bargained-for exchange with Rockwell and are policed by Rockwell not to re-sell "bare" PLCs.

 Thus, Rockwell contends its ADs, intending to meet their contractual obligations to Rockwell, nonetheless sold goods they did not know were intended for Radwell's ultimate purchase and subsequent resale in the U.S. without authorization from Rockwell.[10]  *Id*. ¶¶129 and 161.  Rockwell alleges Radwell either deceived its ADs to breach the AD agreements or received unauthorized Rockwell Products from unauthorized sources (*Id*. ¶¶ 113-119; ¶¶205-206) and could re-sell these products through only a deceptive marketing scheme, via an internet site that markets the products as "Radwell verified substitutes" for authorized Rockwell products.  *Id*. ¶¶123-127.  In addition, Rockwell alleges Radwell knew it could not obtain conforming Rockwell products overtly from a Rockwell AD and

---

[10] The Court notes that Rockwell is careful not to allege any of its ADs could have intentionally sold Rockwell PLCs to Radwell or a Radwell agent, which would point to a breach of Rockwell's "closed" distribution system from within and ultimately to a need to sue one of its own ADs for breach of contract.

intentionally procured Rockwell products in a secretive way because otherwise Rockwell would stop selling to Radwell's source.  *Id.*; *See* ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 23:127-128; 184-190 (Deposition of Edward Iannuzzi, Radwell Global Sales Manager, testifying in the ITC 1074 investigation); *see also id.*, Exhibit 22:96 (Deposition of Brian Radwell, Radwell CEO, testifying in a deposition in the ITC 1074 investigation).

**Radwell**

In its counterclaims (ECF Doc. 222), Radwell asserts generally under Clayton Act §§4 and 16 (15 U.S.C. §§ 15 and 26) and Sherman Act §§ 1 and 2 (15 U.S.C. §§ 1 and 2) that:

Rockwell is a monopolist seller of its PLCs in the U.S.;

its monopoly arises from its collateral conduct with its ADs and which its exclusive dealing contracts with its ADs reinforce.

Such conduct is actually a conspiracy and a closed market system;

that amounts to a non-competitive barrier to entry in the U.S. PLC market and bolsters a price fixing scheme in which Rockwell and its ADs collude.  *See* ECF Doc. 222, ¶¶154-157, 168, 176- 177 (Radwell's Amended Answer to the Complaint and Amended Counterclaims).

Radwell further asserts the relevant product market constitutes PLC products; and these have neither widely used substitutes (as no reasonably interchangeable products exist) nor cross-elasticity of demand (*Id*. ¶¶30-31). Moreover, the relevant geographic market is the United States. *Id*. ¶33.  Radwell states it directly competes with Rockwell and its ADs in the sale of PLCs in each U.S. state and that U.S. PLC customers—which Rockwell defines as VARs, that is OEMs, system integrators, panel shops, and integrated suppliers—look to buy PLCs from only U.S. sellers.  *Id*. ¶34.

Owing to the prohibitions in Rockwell's contracts that prevent ADs from selling non-Rockwell products (*Id*.:83-84), Radwell alleges these contracts create an "all or nothing" requirement to become a Rockwell AD and effectively prevents competing products from entering or penetrating into the U.S. PLC market, forcing an anti-competitive result.  *Id*. ¶¶41-42; ¶150.  The Rockwell contract terms and behavior include:

Rockwell's assignment of a particular territory to each AD;

The AD's express obligation not to sell Rockwell-branded products to any U.S. customer that will resell that product without adding "value" to it;

Rockwell's refusal to offer credit rebates to ADs that sell product outside their assigned territory, which avoids ADs competing with each other by underbidding for the same customer.

Radwell describes that this anti-competitive result arises in the U.S. PLC market in part from end-user preferences about how PLCs are replaced in a factory or machine set up.  Simply, after a PLC

is installed, end-users replace it with the same brand.  That Rockwell PLCs are well established in the U.S. PLC market works in partnership with the conservative buying preferences of end users to solidify the end-user base, thereby locking in the market niche, extent, and power of Rockwell over the sale of PLC products in the U.S.  *See Id.* ¶¶100-102.

Radwell implies that, when considering Rockwell's 65% market share in the U.S. PLC market and U.S. consumer behavior in this market coupled with the prohibition that ADs not sell competing PLCs, Rockwell must be seen as wielding the power of a monopolist to continually maintain very steep barriers to entry and thereby perpetuate its monopoly.  *Id.* ¶¶44-46.  Moreover, Radwell asserts this alleged monopoly power relieves Rockwell from price competition by other PLC manufacturers, which allows Rockwell to sell its PLCs at a premium in the U.S. *Id.* ¶¶ 49-53.  Radwell asserts that 90% of Rockwell sales in the U.S. are done through the Rockwell AD network.  *Id.* ¶56.

Radwell alleges the following combination of factors evidence price fixing between Rockwell and the ADs:

Rockwell sets a "suggested" specific resale price for each product;

 ADs agree to charge the Rockwell-set resale price;

In effect, that resale price is not uniform inasmuch as Rockwell practices price discrimination of products to various classes of consumers—OEMs, system integrator, end-user, and integrated suppliers—which means a different class of consumer will be charged a different price for the same product.

ADs agree to this price discrimination system because their AD agreements with Rockwell prevent other ADs from underbidding each other (because Rockwell pricing rebates are not given to ADs selling outside their territory).  This practice tends to stabilize not only the customer base but also each ADs revenue within its territory, and virtually bars an end-user an opportunity to "shop around" for a lower price.

Radwell asserts the combination of these factors makes disrupting Rockwell's pricing structure virtually impossible and alleges this behavior amount to price fixing and anti-competitive behavior.  *Id.* ¶¶38-39; 43-44; 80-85; 92-95; 97-99; 115-118; 124.  Radwell admits to acquiring Rockwell branded goods through various avenues and then re-selling them in the U.S.  *Id.* ¶¶133-141.

In the past, Radwell had acquired Rockwell-branded goods sold outside of the U.S. and imported them into the U.S. as gray goods, an avenue now closed to Radwell because of its stipulated consent with the International Trade Commission ["ITC"] to stop such importation.  *See supra.*  Radwell also acquires Rockwell-branded goods sold inside the U.S. from either end-users that have excess,

unneeded new products or buys used products and refurbishes them for re-sale.   Radwell also buys Rockwell-branded goods in the U.S. from VARs that had obtained them from an AD at a discounted price only because it had agreed to Rockwell's pre-requisite to add the product to a factory or machine set-up.  That is, "faithless" VARs have paid less for the PLC than an end-user.  In selling a "bare" product to Radwell, a VAR can gain income by arbitraging the Rockwell price.  The VAR charges Radwell more than it paid; and, in turn, by paying less than the fair market value offered to an end-user, Radwell can gain an income opportunity, which is one way Radwell may conduct business in the U.S. PLC market.  *See, e.g.*, *id.*¶¶151-153.  And it is precisely this resale by VARs that Rockwell strives to put an end to by demanding ADs monitor closely and diligently their VARs' fidelity to the no-resell policy.   If a VAR does engage in re-selling to PLC price arbitragers, like Radwell, Rockwell has demanded and obligated ADs to cut off sales to that entity, "as agreed to in the AD agreement".  *See, e.g.*, *id.*¶¶164-171.


### 3.0   Legal Standards

### 3.1   Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). A fact is material only if it can affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).  A material fact raises a genuine issue when the evidence could allow a reasonable jury to return a verdict for the non-moving party.  *Id.*; *see also Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988).

In bearing the initial burden of proof, the movant must present those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   If the movant so demonstrates, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial" (*Fed. R. Civ. P.* 56(e); *Celotex*, 477 U.S. at 324)) through affidavits or otherwise as provided by Rule 56 and "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir. 2002).  If the non-movant fails to do so, the Court must grant summary judgment. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992).  The evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. *Callahan v. AEV, Inc.,* 182 F.3d 237, 252 n. 11 (3d Cir.1999) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)).

Speculation, conclusory allegations, suspicions, or mere denials do not suffice to raise a genuine issue of material fact. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-289 (3d Cir. 2018). Nor does reliance on the pleadings suffice. Rather, the non-moving party "must present affirmative evidence … from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 256.

In evaluating whether a genuine issue of material fact exists, the court considers all facts and ambiguities in the light most favorable to the non-moving party (*Anderson v. Liberty Lobby*, 477 U.S. 242, 255; *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir.2013)) and draws all reasonable inferences in their favor. *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 3d Cir.2011). The Court does not decide "the truth of the matter," but rather whether a genuine issue of material fact necessitates a trial. *Anderson*, 477 U.S. at 242; *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. The court therefore neither weighs evidence nor makes credibility judgments as these tasks are for the fact finder. *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.

When contradictory, material facts are presented, a genuine issue is raised, which undercuts a decision for summary judgment. However, even with a presentation of contradictory facts, there can be no genuine issue when one party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. When the movant has completely failed to show an essential element of its case, all other facts are immaterial. *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992).

**3.2    Other Legal Standards**

This opinion sets forth the legal standard for each issue in turn.

**4.0    Discussion**

**4.1    Jurisdiction and Venue**

This action alleging trademark infringement and other counts under the Lanham Act, 15 USC §1051 *et seq.*,1, and counterclaims under the Clayton Act, and Sherman Act I and II, the Court has subject matter jurisdiction under 15 U.S.C. §1121 and 28 U.S.C. §§1331 and 1338 (b).  As all claims in this action **"**derive from a common nucleus of operative fact" and "are such that plaintiff would ordinarily be expected to try them all in one judicial proceeding" (*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. §1367(a)), the Court also holds pendent jurisdiction over the state law claims.  Venue is proper here under 28 U.S.C. 1391(b) (1) as defendant Radwell is headquartered in Burlington County, New Jersey, a designated county for this vicinage.

**4.2    Lanham Act Questions**

**4.2.1    Trademark Infringement**

In a previous summary judgment motion (ECF Doc. 331),[11] defendant argued that trademark infringement can no longer apply to a good sold in the U.S. that is identical in form and brand to a U.S. authorized good but which lacks the material differences the mark holder passed to only authorized goods.  This Court resolved that motion by declaring the judge-made jurisprudence of trademark infringement owing to material differences between authorized and unauthorized goods was alive and well.  *See Rockwell Automation, Inc. v. Radwell International, Inc.*, 15-cv-05246, 2019 WL 7288946 (D.N.J. 30 Dec 2019).[12] To be clear, this Court's denial of Radwell's previous summary judgment motion was a decision about an erroneous legal theory, in which the Court neither undertook a review nor opined on the existence of a genuine issue of material fact as to Radwell's trademark infringement.  Such a review is done here for the first time.

To properly plead trademark infringement of a registered mark under the Lanham Act, 15 U.S.C. §1114, a plaintiff must demonstrate it owns a valid and legally protectable mark (elements 1 and 2) and that defendant's use of the mark to identify goods/services causes a likelihood of confusion (element 3).  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

For elements 1 and 2, Rockwell's in-force registrations before the USPTO[13], which include the marks asserted here,[14] suffice.

---

[11] *See infra* note 21

[12] *Opining* in response to defendant's previous summary judgment motion that recent Supreme Court cases on the exhaustion of rights for international sales of patented or copyrighted goods did not and could not vitiate the jurisprudence that marked goods sold in the U.S. lacking the material differences of goods authorized by the mark holder infringed the holder's mark.

[13] A list of LIVE U.S. trademarks owned by Rockwell Automation and found on the USPTO's TESS database on 25 Aug 2020 is here; Rockwell's Live U.S. Trade Mark Registrations

[14] See *supra* note 6.

For element 3, the court must analyze: (1) whether "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark," and (2) "the more elementary question of whether [defendants] made any use of the mark."  *Nike, Inc. v. Eastern Ports Custom Brokers, Inc.*, 2:11-cv-4390-CCC-MF, 2018 WL 3472628, at *4 (D.N.J.  19 July 2018) [*citing Zany Toys, LLC v. Pearl Enterprises, LLC*, No. 13-5262, 2014 WL 2168415, at *8 (D.N.J. 23 May 2014).

It is undisputed that Radwell sold Rockwell goods bearing Rockwell marks in commerce and was not authorized to do so.  ECF Doc. 596-1:13 (Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute).

Neither do the parties dispute that key to determining trademark infringement here is the likelihood of consumer confusion generated by Radwell's selling unauthorized goods for sale in the U.S. Thus, even if an unauthorized Rockwell-branded good is identical in form and function to an authorized good, trademark infringement may still lie when the unauthorized good lacks a material difference that causes consumer confusion as to the source of the goods sold in the U.S. *Société Des Produits Nestlé, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633 (1st Cir. 1992).

As for consumer confusion as to the source of the mark, the parties do not generally dispute the applicability of the legal theory of "material differences" infringement.  That is, it is not disputed that unauthorized sales in the U.S. of Rockwell-branded products that differ materially from authorized products sold in the U.S. could result in consumer confusion as to the authenticity of the materially different products. ECF Doc. 528:2-3 (Defendant's Summary Judgment Motion; ECF Doc. 530 (Plaintiff's Summary Judgment Motion).

In this Circuit, a material difference between goods simultaneously sold in the same market under the same mark creates a presumption of consumer confusion as a matter of law. *Ferrero U.S.A., Inc., v. Ozak Trading Co. et al.*, 753 F.Supp. 1240, 1246, judgment aff'd by *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 935 F.2d 1281 (3d Cir. 1991).  *See also A & H Sportswear, Inc.*, 237 F.3d at 216 *stating* "the single most important factor in determining likelihood of confusion is the mark similarity".  And, "If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves [in determining likelihood of confusion] (citation omitted)." *Id*. at 214.

The plaintiff's burden of proof to establish trademark infringement is preponderance of the evidence. *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 120, 125 S.Ct. 542, 160 L.Ed. 2d 440 (2004) [only when a plaintiff has shown likely confusion by a preponderance of the evidence does a defendant have any need of an affirmative defense].   Following the Supreme Court and the Third Circuit, this Court finds, since Radwell and Rockwell have each admitted to selling the same products in the U.S. market and that Radwell goods and Rockwell-authorized goods bear the

same marks, Rockwell has met its burden of proof as to likelihood of confusion.   Specifically, Radwell's unauthorized U.S. sales of Rockwell-branded goods likely cause consumer confusion not only because of the material differences between its goods and Rockwell's, but also because Rockwell, as holder of the intellectual property that identifies the source of the PLCs, had not authorized Radwell sales of the marked PLCs.  Such lack of authorization is indisputable.

Besides the undisputed fact that Radwell sold in the U.S. Rockwell-branded goods that did not bear the same features of authorized goods (ECF Doc. 140 (the Complaint)), other facts are also undisputed.  These include: the ITC 1074 investigation ended with  Radwell's consent[15] **NOT TO ENGAGE** in certain behavior, namely, selling, or importing, or inducing a third party to import, in the U.S. unauthorized Rockwell-branded goods.

Thus, the ITC 1074 Investigation consent order concerned ONLY Radwell's prohibited behavior regarding "unauthorized gray goods"[16]  and neither addressed nor prohibited Radwell's acquiring, selling, or distributing in the U.S. Rockwell-branded products from resellers located in the U.S, termed here "unauthorized domestic goods".

At a most fundamental level, the parties do not dispute that Radwell sold nonconforming goods in the U.S., which this Court finds were likely to cause consumer confusion.  As used herein, the term "nonconforming" refers to Rockwell marked goods that do not bear the Rockwell warranty or customer service add-ons because Rockwell had not authorized these for sale in the U.S.

What the parties dispute is the standard of trademark law to be applied to the facts.  In particular, the parties dispute whether the Third Circuit's or the Federal Circuit's standard should be applied to determine if Rockwell's own behavior would also create consumer confusion and thereby,

---

[15] Certain Industrial Automation Systems and Components Thereof, Including Control Systems, Controllers, Visualization Hardware, Motion and Motor Control Systems, Networking Equipment, Safety Devices, and Power Supplies, Investigation No. 337-TA-1074, USITC Order No. 42 (20 July 2018).  The Court takes note of this information as a matter of public notice.
[16] Considering Radwell's Evidentiary Objections and Motion to Strike in Connection with Its Opposition to Rockwell's Motion for Summary Judgment (ECF Doc.  596-2) in which Radwell objects to Rockwell's proffering as evidence of Radwell's infringement the decision in the ITC 1074 investigation AFTER Radwell had stipulated out, the Court relies here only on information that directly pertains to Radwell's agreement with the ITC, and not to any later proceedings where Radwell was no longer a party.   Available as a matter of public record, this information the Court can take public notice of.
Actually, the 1074 ITC Investigation consent order could not be clearer:
...**"Radwell agrees not to sell for importation, import into the United States, or sell in the United States after importation**, or knowingly aid, abet, encourage, participate in, **or induce the sale for importation, importation into the United States, or sale in the United States after importation**, of industrial automation systems and components thereof, including control systems, controllers, visualization hardware, motion and motor control systems, networking equipment, safety devices, and power supplies, that infringe U.S. Trademark No(s). 1,172,995; 696,401; 693,780; 1,172,994; 712,800 ; 712,836; 2,510,226; 2,671,196; 2,701,786; and/or 2,412,742 ("Asserted Trademarks"), or U.S. Copyright Reg. No(s). TX0008389890; TX0008389887; TX0008390098; TX0008390094; TX0008390077; TX0008390088; TX0008390116; TX0008390084; TX0008390111; and TX0008390091("Asserted Copyrights"), or are acquired or sold through unfair methods of competition and unfair acts in importation or sale (collectively "Accused Products") **except under consent, or a license from Rockwell, its successors or assignees**.
3. Upon entry of the Consent Order, **Radwell will not sell within the United States or otherwise transfer (except for exportation) any remaining inventory of imported Accused Products** in the United States.

give Radwell a defense that would relieve its infringement liability.

To the point, Radwell presumes that *SKF USA Inc. v. International Trade Commission*, 423 F.3d 1307 (Fed. Cir. 2005) is the more suitable legal precedent because there the Federal Circuit analyzed the alleged infringer's possible defense against infringement liability:  whether the mark owner itself had created consumer confusion by importing and selling  goods in the U.S. that were not accompanied by the material differences of conforming goods.  No only relying on different case law than the Third Circuit's, Radwell also re-defines Rockwell's term, VARs (value-added resellers),[17] to mean simple, i.e., "bare", re-sellers.  ECF Doc. 528:15-16.  Radwell's re-definition of VARs is that, regardless of the integrated electrical, electronic, systemic, mechanical, or physical context into which a VAR inserts a PLC, a VAR is always a "bare" re-seller of that PLC.  Radwell discounts the value-add of the installation context.

Redefining VARs as "bare" resellers grounds Radwell's argument that Rockwell's own behavior relieves Radwell of trademark infringement liability.  Radwell alleges it is Rockwell's own non-conforming goods sold by VARs as "bare" resellers that create consumer confusion, and therefore provides Radwell a defense against its own infringement.

Put simply, Radwell claims all Rockwell PLCs sold by VARs in a value-added context cannot be said to bear the material differences of goods sold through Rockwell ADs.  In a nutshell, and this is critical to Radwell's argument, this is because the PLCs that VARs "resell" to consumers cannot pass on the warranty and other features of the PLCs that the ADs sell.   Therefore, all PLCs that the VARs sell are non-conforming and that the percentage of such resales is not within the percentage allowed by the Federal Circuit in *SKF*.   Radwell contends the Rockwell-condoned re-selling by VARs creates consumer confusion as to which of Rockwell's own U.S. goods bear the material differences of warranty, quality, etc., and which do not.   As *SKF* concerns a situation in which the mark holder sold in the U.S more than 10% of its product lacking material differences, Radwell's reliance on Federal Circuit case law empowers it to argue that *SKF* as precedent removes a but-for cause of consumer confusion from Radwell's gray goods and gives Radwell a defense and a pass on its own liability for trademark infringement.

Rockwell argues the proper material differences infringement standard is the Third Circuit's in *Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3d Cir. 1998).

The parties' arguments notwithstanding, the situation here is more complicated than simply choosing between the Third Circuit's or the Federal Circuit's jurisprudence on the trademark infringement of materially different goods.  Because of the ITC consent order with Radwell, this Court presumes that any possible trademark infringement by Radwell involving "unauthorized gray goods" ceased after 20 July 2018. Therefore, any possible trademark infringement by Radwell after the consent order can concern only "unauthorized domestic sales."

---

[17] System Integrators, OEMs, panel shops, etc.

In this matter, then, there is an issue of trademark infringement arising from U.S. sales of non-conforming (also termed equivalently here, as "unauthorized") products either imported as gray goods or acquired within the U.S.  Since the original complaint dating to 7 July 2015 (ECF Doc. 1 ¶¶22-34) and the second amended complaint (ECF Doc.140, at least at ¶¶51 to 150), which controls here, pleaded trademark infringement for unauthorized U.S. sales, material differences infringement for both "unauthorized gray goods" (those before the ITC consent order issued) and "unauthorized domestic goods" are considered here.

Not having been imported in the U.S., "unauthorized domestic sales"[18] could not properly be the subject of a §337 investigation[19] nor a Federal Circuit appellate review.  Lacking a legal or factual basis for applying from the beginning Federal Circuit jurisprudence, the material differences standard for unauthorized domestic sales must begin with the Third Circuit's standard in *Iberia*.  There, the court rejected the mark holder's simple assertion that the unauthorized vs. the authorized U.S-sold products materially differed and required a showing of a non-pretextual difference between the two. *Iberia*, 150 F.3d at 304.  The court found that a material difference need not be a formal or physical feature but included any quality or attribute that, if the product were sold without it, would likely damage the goodwill developed by the trademark owner. *Id* relying on *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996) for the proposition that a "trademark holder must show that it uses substantial and non-pretextual …procedures such that the nonconforming sales will diminish the value of the mark". *Id.* at 6.

As for whether importation of "unauthorized gray goods" should be considered under the Federal Circuit's or the Third Circuit's standard, this Court declines to supplant the Third Circuit's jurisprudence on any legal issue that the Third Circuit has ruled on.  As practiced in all Districts, when full guidance of the home Circuit, here the Third, is lacking on a legal issue, the District Court looks to that of other Circuits, adopting it to a greater or lesser extent in alignment with the home Circuit's previous pronouncements.  Thus, urging the Federal Circuit's jurisprudence over that of the Third's, instead of as a supplement to it, proposes a misguided hazard of unnecessarily muddling an uncontested Circuit precedent.  This Court confirms the starting point for reviewing the motions here and the legal grounding of material differences infringement is *Iberia*.  Should deciding these motions call for a more finely-tuned legal discrimination than in *Iberia*, this Court will look to the case law of other Circuits to fill in.[20]

---

[18] To reiterate, these are sales of products that Radwell may have acquired in the U.S. but which are unauthorized and do not bear the same features as authorized products sold in the U.S.  These sales may also be called here "nonconforming".
[19] *See supra* note 8.
[20] An example of this Court's rounding out the Third Circuit's pronouncements with jurisprudence form other Circuits can be found in the opinion on defendant's previous summary judgment motion. *See Rockwell Automation, Inc. v. Radwell International, Inc.*, 15-cv-05246, 2019 WL 7288946 (D.N.J. 30 Dec 2019) [this Court relying on a Second Circuit case to show that *Lexmark* and *Kirtsaeng* had no effect on the vigor of material differences jurisprudence]

The deciding issue in *Iberia* being whether the imported goods bore the same physical quality as the imported ones, the *Iberia* court faced a relatively straight-up yes or no answer as to whether material differences existed. *Iberia*, 150 F.3d at 302. In deciding the domestic and imported goods were not materially different, the *Iberia* court found the imported goods non-infringing and concluded that a single, non-pretextual material difference between conforming and non-conforming goods could justify infringement. *Id.* at 305-306.

However, neither in *Iberia* nor in other cases has the Third Circuit wrestled with the issue presented here by defendant: whether Rockwell's tolerance of resale by VARs of a greater than *de minimis* quantity of allegedly non-conforming goods vitiated the infringement claim against Radwell's U.S. sales of imported or domestic non-conforming goods. Put differently, defendant seeks this Court to resolve whether Rockwell's allegedly passive condoning of VARs re-selling of non-conforming U.S. goods confuses consumers and relieves Radwell of infringement liability. Case law from other Circuits fills in the *Iberia* guidance.

Since both parties seek summary judgment on the trademark infringement issue (*See supra* Table 1), this Court does not review the facts relating to infringement in a light favorable to either, but. "[i]f upon review of cross motions for summary judgment, we find no genuine dispute over material facts, then we will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia*, 150 F.3d at 302.

Defendant has urged the relevance of *SKF USA Inc. v. International Trade Commission*, 423 F.3d 1307 (Fed Cir. 2005) because it established a defense to trademark infringement when the mark holder's own nonconforming sales in the U.S. were above a certain percentage of its total U.S. sales. This Court considers such case law in its review of Radwell's defense to infringement.

In *SKF*, the Federal Circuit affirmed the ITC decision that the alleged infringer's importation of SKF gray goods, i.e., ball bearings, did not violate §337 (19 U.S.C. §1337). The ITC rationale was, not all or substantially all of the mark holder's own ball bearings sold or condoned for sale in the U.S bore the material differences of its conforming U.S. goods, which the ITC found determinative in creating consumer confusion as to the source of the goods and relieving the alleged infringer of liability.

The relevant material differences were SKFs on-site technical services and hotline customer service. *SKF*, 423 F.3d at 1317. The ITC found dispositive that not all of SKFs U.S. sales done by its very own business unit, Chicago Rawhide, bore these extra services, which were actually discretionary and based on criteria chosen by SKF itself. *Id.* Importantly, the ITC decision hinged not on consumer expectations about receiving such extra services—and therefore on consumer confusion about not receiving them—but on the fact that not all, or substantially all, of SKF U.S. goods were "predictably and consistently" accompanied by material differences. *Id.*

Although not expressly defining the meaning of "substantially all sales", the Federal Circuit did

reject the standard set forth in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, C*o., 112 F.3d 1296 (5th Cir. 1997) that even one sale by, or condoned by, the mark holder of non-conforming goods relieves the gray goods importer of infringement liability. *Id*. at 1315-1316. Noting "the '*all or substantially all sale*s' benchmark …certainly permits a small amount of non-conforming goods". The Federal Circuit merely affirmed without much legal rationale, mainly because of SKF's discretion in deciding which customers got goods with material differences.  *SKF*, 423 F.3d at 1317.

Partly because of that simplistic affirmance, the ITC finding that only 90% of all SKF U.S. sales were conforming has become <u>the</u> legal benchmark of when a mark holder's U.S. non-conforming sales suffice to relieve infringement liability. Since SKF, the Federal Circuit has, to a minor jurisprudential extent, refined this  benchmark in a family of related cases involving Deere forage harvesters, starting with *Bourdeau Bros., Inc. v. ITC*, 444 F.3d 1317 (2006).[21]

In summary, *Iberia* provides that a single, non-pretextual material difference between authorized goods and unauthorized ones can justify a finding of trademark infringement.  *SKF* fills in *Iberia* for the situation when not all or substantially all of the authorized U.S. goods are materially different from the unauthorized goods sold in the U.S. by a third party. From the *SKF* and the *Bourdeau-Deere family* of cases coupled with *Warner-Lambert*, the benchmark is that even 4.4% of non-conforming U.S. sales

---

[21] There, the mark holder Deere had brought a §337 claim against its own European distributors for selling in the U.S. those Deere harvesters destined for the European market, and which materially differed from the harvesters authorized for sale in the U.S. *Id*.at 1320. In finding the European harvesters had infringed for lacking the material differences of the U.S. goods, the ITC issued an exclusion order.

On a first appeal, the Federal Circuit vacated and remanded the matter back to the ITC to require Deere to meet its burden of demonstrating either it had not condoned the importation of the European harvesters and / or the number of European-imported harvesters was small and not substantially all of its U.S. harvester sales.  But, the Federal Circuit still did not expressly define what percentage of total U.S. sales constituted "not substantially all". *Id*. at 1325.

On the first remand, the ALJ found infringement because Deere had not authorized the importation of the European harvesters even though the number of European harvesters sold in the U.S. was so small as to have negligible effect on the goodwill of Deere's marks.  *See Deere v. ITC*, 605 F.3d 1350 (Fed. Cir. 2010).  The full ITC reversed the ALJ, finding Deere had indeed authorized the European harvester sales.  The matter was again appealed.  *Id*. at 1353.

On the second appeal, the Federal Circuit affirmed that Deere had so authorized the European harvester sales in the U.S but remanded for a second time to the ITC only for its proper calculation of the mark holder's non-conforming U.S. sales relative to the total U.S. sales, which devolved to this ratio:

<u>Number of Deere European harvesters sold in the U.S.</u>

Total number of Deere harvesters sold in the U.S.

*Id. at* 1358 – 1360.  Deere had argued evidence to the ALJ that showed this ratio to be 141 / 1451, which meant the European harvesters sold in the U.S. constituted but 3.1% of all U.S.-sold harvesters.  Deere had further argued to the ALJ that this percentage  was insufficient to defeat its trademark claims against Bourdeau, relying on *Warner–Lambert Co. v. Northside Dev. Corp*., 86 F.3d 3 (2d Cir.1996).  There, the Second Circuit had found authorization of 4.4% of non-conforming sales to be small enough to allow the mark holder relief.  Also, in its second appeal, the Federal Circuit agreed with Deere's argument.

On the second remand, as required, the ITC used the above ratio to determine whether that small percentage of non-conforming sales relieved infringement liability (*Id*. at 1359-1361) and in particular whether "96.6 to 96.9% [of sales that are conforming] is 'substantially all.' " *Id*. at 1362.  Specifically, the ITC found that since the 96.6% of all U.S. sales were conforming, Deere's trademark infringement claims were viable.

There was a third appeal to the Federal Circuit, this time by Bourdeau, but that court affirmed the ITC's finding.

authorized by the mark holder does not vitiate a mark holder's claims of infringement, but 10% does.[22]

This review of relevant standards highlights those facts, if properly supported, which would resolve the parties' requests for summary judgment of Count I.   They are:

1)      whether Rockwell-branded PLCs sold by Radwell in the U.S. were materially different from conforming Rockwell PLCs sold in the U.S.; and

2)      whether Rockwell condoned sales of non-conforming PLCs in the U.S., and if so, what percentage of Rockwell's total U.S. PLC sales were non-conforming.


**1) Were Radwell's PLCs sold in the U.S. materially different from Rockwell-authorized, that is, conforming PLCs sold in the U.S.?**

First, Radwell does not dispute it lacks Rockwell's authorization to sell Rockwell-branded PLCs in the U.S. and that such PLCs bear Rockwell's asserted marks.  ECF Doc. 528-1:1-2 (Radwell's Statement of Material Facts Not in Dispute); *see also* ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 24 (ECF Doc. 530-26) in which Radwell admits it is not an authorized Rockwell Dealer.   It is also undisputed that Radwell sells PLCS in the U.S. bearing Rockwell's asserted marks.

Rockwell declares it attaches three material differences to its U.S. PLCs sold in the U.S.by its ADs or itself: its manufacturer warranty; its post manufacture quality control measures; and its product safety, recall and security notices that address safety issues.  ECF Doc. 530-1:6-7; 14-16; and 30-32 (Rockwell's Statement of Material Facts Not in Dispute); *see also* ECF Doc. 140 ¶34 (the Complaint).

Rockwell also asserts that the Rockwell-branded PLCs Radwell sells in the U.S. lack these.  ECF Doc. 530-1 ¶38 [different warranty because Rockwell does not extend its warranty to unauthorized PLCs]; *Id*. ¶¶86-92 [Radwell products lack disclaimers about their chain of control and ownership and whether they are factory new or not]; *Id*. ¶121 [Radwell admits it does not notify customers of product safety notices or bulletins as Rockwell alleges it does through its AD network.

Second, this Circuit's standard of review in *A&H Sportswear* for consumer confusion when marks of the conforming vs. non-conforming goods are identical compels this Court to find Radwell goods, because they were unauthorized, created consumer confusion as to source.

Third, in addition to this finding, Rockwell has demonstrated there is no genuine dispute of material fact that Radwell is liable for trademark infringement under *Iberia*: the absence of any of these material differences in Radwell's nonconforming goods sold in the U.S. would harm the goodwill of the asserted marks.  To that end, Rockwell's survey expert found that 78% of his survey respondents (which included hundreds of purchasers of industrial, electrical, and electronic control equipment, and which this Court recognizes as potential consumers) reported that the original manufacturer's warranty was

[22] However, there is still a lack of clarity as to how much more than 4.4% and less than 10% of the mark holder's non-conforming sales in the U.S. preserves trademark infringement liability.

important / very important to their purchasing decision.  If that warranty were absent, 73% said they would no longer be interested in purchasing. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 30 (Witness Statement of David Franklyn) at Q68-69.

Radwell disputes whether Rockwell actively offered or could oversee effectively the transmission of two of these material differences, the quality control measures and the safety notices. ECF Doc. 596-1:7, 8-10 (Defendant's Response to Plaintiff's Statement of Material Facts Not In Dispute).[23]

The importance of a warranty, however, as a material difference that can affect the goodwill of the marks cannot be disputed. Radwell itself offers its own warranty on the unauthorized Rockwell PLCS it sells and its president admitted a product warranty is important. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 22 (Deposition of Brian Radwell, 14 Feb 2018) 99:15-19; 105:16-20). To that end, Radwell provides its own warranty. *Id.* at 98:3-20. This Court therefore finds that at a minimum Rockwell's product warranty is a material difference between authorized and unauthorized PLCs sold in the U.S.[24]

If Radwell could assert no defenses, the material difference of Rockwell's warranty on conforming goods vs. its absence on non-conforming goods would resolve finally Radwell's trademark infringement under *Iberia.*

**2) Whether Rockwell condoned non-conforming sales in the U.S. and what percentage of its total U.S. PLC sales were non-conforming.**

However, as *SKF* and the *Deere-Bourdeau* family of cases demonstrate, the defense for alleged trademark infringers requires a showing of the mark holder's toleration of non-conforming sales, which must equal 10 % or more of the total U.S. sales.

In asserting the defense, Radwell's argument is this:

- Once an AD buys a Rockwell PLC, the material differences pass to the ADs.  Because of the ADs contractual obligations with Rockwell, when the ADs sell the PLC to a VAR, the material differences pass to the VAR.

- Importantly, Radwell alleges, as the vast majority of VARs have no contract either with Rockwell or the ADS, a VAR has no contractual obligation to pass on the Rockwell warranty (or incidentally other material differences) to the end-user.

---

[23] However, Rockwell notes: Radwell admits quality control of the PLCs is important to customers and does not dispute its nonconforming products do not bear Rockwell's post-manufacturing quality control. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 33 (Deposition of Jason Larsen, a Radwell employee with authority to represent Radwell before the ITC and self-reporting as Radwell's previous quality assurance manager, 28 Feb 2018) 93:19-94:2; 115:14-116:1; 118:4-119:4; 121:11-122:17; 279:1-9; 309:7-310:20 (addressing quality control); 424:9-425:17.

[24] In so doing, the Court makes no finding here about whether absence of the other two material differences harm or not the goodwill of the asserted marks, which plaintiff may seek to adjudicate.

- In short, since the VARs are not routinely obligated to pass on the warranty, Rockwell relies on the discretion of the VAR to pass the warranty on to end-users.

- Whenever a VAR buys an authorized Rockwell PLC in the U.S., the material differences accompanying that PLC may, at the VARs option, not reach the end-user.  This lack of control by Rockwell over the routine, systematic transfer of material differences to every end-user prompts Radwell to re-define any resale by a VAR as non-conforming, whether Rockwell-condoned or not and regardless of Rockwell's efforts to have its ADs police VARs for non-value-added resales.   ECF Doc. 528: 19-21 (Radwell's Summary Judgment Motion); *see also* ECF Doc. 596-1:7 -8 (Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute);

- since Rockwell has no control over whether VARs pass on the material difference, to wit the Rockwell warranty, end-users would consider all of Rockwell's PLCs non-conforming; and.

- to the point, the authorized Rockwell PLCs  sold in the U.S. to VARs amount to about 70% of its total U.S. sales, which under *SKF* and the *Deere-Bourdeau* line of cases relieves Radwell of infringement liability.  ECF Doc. 528:22 (Radwell's Summary Judgment Motion).

As for condoning a VAR "bare" resale, i.e., when the VAR has not added value, Rockwell alleges it took reasonable efforts to monitor and protect the brand against unauthorized resale by VARs.  For example, it methodically sends letters from time to time to those VARs termed system integrators, warning them not to resell the product to their customers except for a value-added use.  In fact, Rockwell cites several instances of its detection that certain VARs, without adding value, were re-selling Rockwell PLCs to end-users, including Radwell, and that it had expended money and resources to investigate the origins and reasons for such sales and to end them.  ECF Doc 530-1: 64-71 (Plaintiff's Statement of Material Facts Not in Dispute).  Particularly salient are statements made by Kathleen Bentley, Rockwell's Director of Global Programs, whose job was to investigate alleged sales of gray market goods and to enforce Rockwell's policy prohibiting unauthorized resale of Rockwell's goods to end-users. *See* ECF Doc. 530-1:68-77, in which Ms. Bentley testified in the ITC 1074 investigation on 1 Jun 2018—one month BEFORE Radwell's stipulated consent order with the ITC[25]— as both a Direct and a Rebuttal Witness about at least 4 separate investigations that Rockwell conducted into VARs resales to end-users, including Radwell.  For example, Ms. Bentley testified that Rockwell actually sent a person to Rochester Industry, a VAR located in China, only to discover there was no such entity, the given address was an empty apartment, and its given U.S. address was an empty lot in Rochester, New York.

[25] Radwell has requested to exclude evidence from the ITC 1074 investigation AFTER its consent order, dated 12 July 2018. Radwell argues that evidence collected in this ITC investigation cannot pertain possibly or logically to Radwell.  Taking into account that Radwell could neither have rebutted nor been afforded due process for such evidence taken after this date, the Court does not consider testimony in the ITC 1074 investigation dated AFTER Radwell's consent order.  However, Rockwell testimony before that date would have been afforded Radwell's cross-examination, review, and due process to rebut and correct.  Therefore, Ms. Bentley's testimony, taken before Radwell's consent order and laid open to Radwell's review and objection, must be considered admissible here.

*Id.* at 70.

 To the point, allegations in Radwell's own Counterclaims, while focused on showing Rockwell's alleged antitrust violations, nonetheless confirm Rockwell's engagement with its ADs to monitor and protect its brand from improper resale.  ECF Doc. 222 ¶¶154-157.  Particularly, Radwell emphasizes that not only do the AD distributor contracts create distributor exclusivity in the U.S. but obligate ADs to report to Rockwell the particulars of each sale so that Rockwell can review whether the VAR / end-user might be acting  "competitively", in other words., engaging in "bare" resales. *Id.*¶¶ 161-169. Moreover, that Rockwell with some of its ADs created a decades-long, stable, working group devoted to looking into the kinds and quantity of unauthorized sales bespeaks Rockwell's lack of tolerance for such sales, particularly because, as Radwell notes, they erode Rockwell's own revenue. Id. ¶¶ 146-149.

Radwell alleges that even a cursory investigation by Rockwell into the behavior of certain VARs, such as CCED and others, would have revealed to Rockwell that these VARs were in the business of bare re-selling of Rockwell PLCs to end-users.  ECF Doc. 528-1¶¶55-57 (Radwell Statement of Material Facts Not in Dispute).. Radwell seems to imply that, since CCED had been in that business for long enough to sell millions of dollars of non-conforming goods, Rockwell either must have known about CCED's "real" business or was quite careless in its investigations.[26]  Radwell misses the mark with this implication.  *Iberia, SKF* and the *Deere-Bourdeau* case family do <u>not</u> require diligence in preventing non-conforming sales but simply turning a blind eye tolerance to them.[27]

Unlike here, in *SKF* and *Deere-Bourdeau*, the mark holder's non-conforming sales reveal a telltale tolerance.  *SKF* and *Deere-Bourdeau* do not detail the mark holder's attempts to investigate and stop the non-conforming third party sales, let alone employ a manager whose sole function was to look into non-conforming gray goods sales and work with the ADs to end them.  ECF Doc 530-1: 64-77 (Plaintiff's Statement of Material Facts Not in Dispute).

The Court finds that, since both parties disclose Rockwell's efforts to ferret out and terminate non-conforming sales—albeit with different reasons for the disclosure—there can be no genuine dispute of material fact that Rockwell did not condone non-conforming sales of its PLCs in the U.S.

But, that's a relatively minor part of the inquiry.  Of greater import to Radwell's defense to trademark infringement is its allegation that all of Rockwell's authorized sales to the VARs are non-

---

[26] When it learned that CCD, a Rockwell AD bound by its AD agreement, was selling unauthorized gray goods to Radwell, Rockwell sued CCD in Federal District Court for violating its agreement.  ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 9 (Rodney Michael Direct Witness Statement in the ITC 1074 Investigation at Q97, dated 1 June 2018).  Rodney Michael was testifying as Rockwell's Director of Global Market Access.

[27] Moreover, testimony by Rodney Michael (*see supra* n. 21) during the ITC 1074 investigation belies Radwell's assertions of Rockwell's lack of diligence in following up suspicions that a particular VAR, LEC, was actually not adding value to customer-requested installations/systems. ECF Doc. 529-1 (Declaration of Peter Shapiro), Exhibit 1: 73-89 (Deposition [individual] of Michael Rodney in the ITC 1074 Investigation, dated 1 February 2018 [before Radwell's consent order]) [testifying to how Rodney actually confirmed LEC was a front for re-selling Rockwell PLCs].

conforming because a VARs transfer of a material difference to the end-user relies on the discretion of the VAR. Radwell's argument attempts to re-create the *SKF* scenario whereby the material difference accompanying a conforming good is passed on only via discretion and not regularly. If supported by the facts, this allegation would negate Rockwell's showing of no tolerance for non-conforming sales and sustain Radwell's defense to trademark infringement.

The material fact determinative of Radwell's trademark liability is whether substantially all of Rockwell PLCs are sold to Rockwell's customers with a warranty. Radwell says no, they weren't. Rockwell says yes, they were.

At first glance, this disparity appears to raise a genuine dispute of material fact. However, as *Celotex*, 477 U.S. at 322–23 directs, Radwell, as movant of a summary judgment for non- infringement, must show that warranties do not attend substantially all of Rockwell's new, authorized PLCs sold in the U.S.. Also as *Celotex* directs, since Radwell must make this showing at trial, it is Radwell's burden to demonstrate this fact here. *Id.* If Radwell fails to show this essential element of its defense against trademark infringement, "all other facts are immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992).

To be clear, this required showing by Radwell does not contradict or lessen Rockwell's burdens of proof required by *SKF* or the *Deere-Bourdeau* cases. That is, as movant of a summary judgment in favor of infringement, Rockwell bears the *SKF* burden of demonstrating Radwell has no defense because substantially all of its new, authorized PLCs sold in the U.S. entailed warranties to its customers.

At this point, that the parties bear competing burdens does not necessarily translate into a genuine dispute of material fact. Only if both parties meet their burdens of proof as to whether warranties were or not included in substantially all U.S. sales will a genuine dispute of material fact emerge.

Both parties assert that Rockwell sells 5% of its authorized product in the U.S. directly to end-users and the rest to its ADs. ECF Doc. 528:9-10 (Radwell Summary Judgment Motion); ECF Doc. 635:6 (Radwell Reply in Support of its Summary Judgment Motion). Radwell also asserts that 70% of the PLCs sold to ADs eventually reach end-users by way of VAR "resales", which Radwell characterizes as "non-conforming". ECF Doc. 588: 9 (Radwell Opposition to Rockwell SJ Motion). Radwell further avers end-users receive no warranty from VARs.

Therefore, if this assertion is accurate, at least two-thirds of all authorized Rockwell sales in the U.S. are not conforming. This assertion, however, is not backed up by facts, but is merely Radwell's alternative interpretation to the behavioral / economic reality of how Rockwell sells and warrants PLCs in the U.S., which relies on the following information from Rockwell Manufacturer's Warranty ECF Doc. 530-3 (Declaration of Paul Tanck) Exhibit 25 (Rockwell's Warranty) which states "The following

manufacturer's warranty [which is 1-year for hardware] is extended to customers purchasing Allen-Bradley® or Rockwell Software™ Products (including related services) directly from Rockwell Automation or an authorized Allen-Bradley distributor; and a statement made in a deposition during the ITC 1074 investigation.  ECF Doc. 529-1 (Declaration of Peter Shapiro), Exhibit 1: 73-89 (Deposition [individual] of Rodney Michael, Rockwell's Director of Global Market Access in the ITC 1074 Investigation, dated 1 February 2018); and *See* Declaration of Paul Tanck, Ex. 20 (Deposition of Rodney Michael, 27 March 2018) at 71:3-72:5) ("I said that the OEM might offer a two-year warranty on the product. That's their prerogative. But if the product fails within the warranty period that we've given the OEM and the customer returns it to them, **we will honor that warranty through the OEM**.")) [emphasis added].

To the point, Radwell's alternative interpretation relies on its legalistic conviction that, if Rockwell does not have a contractual, i.e. formal, obligation to provide the end-user the benefit of its warranty, then the warranty cannot possibly pass from AD to VAR and then from VAR to end-user to thereby accompany the PLC.  That is, Radwell's assumption is that only a contractual obligation to the end-user can create a passing of the warranty.  Further, this legalistic assertion that the end-user must receive Rockwell's formal obligation of warranty fully grounds Radwell's reframing of the function of the players in Rockwell's distribution chain.  To that end, Radwell characterizes VARs not as **Value-added** resellers, but as simple ("bare") resellers, because no legal obligation requires them to pass their warranty on to end-users.

Radwell also re-characterizes Rockwell's business model in such a way as to assert the Rockwell warranty could passes ONLY to its ADs because Radwell construes ADs as first "buyers" in the distribution chain.  This re-characterization is assertion only, not supported by the business realities, and in effect inaccurate describes how Rockwell characterizes its sales to ADs and how ADs function in Rockwell's distribution chain.  This is because, although ADs are independent contractors, ADs function as Rockwell's distribution <u>agents of IP-containing goods</u> because of the very obligations they agree to in the AD agreement.  ECF 531-3, Exhibit 27.  Put differently, Rockwell "licenses" ADs the right to sell its marked goods and gives them a discounted price for the IP-containing goods in exchange for the AD's promise not to sell to "bare" resellers.  To be clear, Rockwell does not specify that it gives AD a license, but it may be inferred that is what Rockwell does.   Because of that, Rockwell does not regard its selling PLCs to ADs as "the first sale" to which a warranty is attached. Rather, Rockwell's sales to ADs is the pre-requisite of creating a distribution chain through which PLCs are offered for sale.  To the point, Rockwell considers sales from an AD to a VAR as the "first sale" accompanied by its warranty and other material differences.   Rockwell consequently regards VARs as its customers.  In addition, the Rockwell Director of Global Market Access, Rodney Michael, testified that Rockwell provides warranties for all new sales of authorized U.S. PLCs even those sold by ADs outside their territory but within the U.S.

ECF Doc. 591 (Declaration of Paul Tanck), Exhibit 60:Q55-56 (Rodney Michael Rebuttal Witness Statement in the ITC 1105 Investigation [which Radwell requested to initiate].

  As stated above, Radwell's reinterpretation of Rockwell's business model also includes a re-labelling of the VAR's function such that the VAR becomes a "bare" re-seller.  Such re-labelling fails to recognize the reality that a VAR sells a product / service fundamentally different from the actual PLC, which is but a part in the VARs installation.  Equally distorting is Radwell's interpretation that the end-user must necessarily be Rockwell's customer, which then equates the end-user to be both Rockwell's customer and the legal consumer likely to be confused.  Ultimately, Radwell must equate the customer with the consumer in Rockwell's distribution chain in order to create a "factual" basis for its assertion that Rockwell warranties do not flow to the "consumer".  But, Radwell's re-labelling of the levels in Rockwell's distribution chain is simply interpretation, and does not evidence how Rockwell's warranty obligations actually flow.

  Although undisputed that Rockwell does not have an executed written contract with each VAR that buys from an AD, having such an agreement would be akin to having a contract with EACH purchasing customer. Radwell asserts this fact as proof that Rockwell does not extend a warranty to each "consumer".  But, as clarified above, this is an ideation that misstates the business reality, which is that it is VARs that are Rockwell's customers and that Rockwell does indeed extend a warranty to every entity that purchases a PLC in the U.S., whether the sale occurs via an AD to a VAR as customer or as a direct sale from Rockwell to an end-user, as customer.

  In the final analysis, Radwell's defense against infringement rests on the assertion that Rockwell's warranty does not flow from the VARs to the end-user and cannot do so in the absence of a contractual obligation between Rockwell and the end-user.  But, that is neither supported by the facts nor sheds light on how Rockwell PLCs in a VAR installation are actually warrantied.  There is no need for a VAR to be bound in an agreement with Rockwell to receive the warranty because Rockwell offers its special discounted pricing to a VAR (available exclusively from an AD) ONLY if the VAR promises not to engage in "bare" sales but to sell the PLC as part of its value-added installation / service.  Thus, a VAR ONLY gets to buy a discounted PLC and become Rockwell's "first purchaser" and "customer" when it has engaged in a bargained-for exchange with Rockwell, which may or not be formalized in writing.  Put differently, every VAR has a *quid pro quo* relationship with Rockwell in which there is a promise exchanged for a warranty:  buy at a discount price and get Rockwell's warranty if one obligates oneself not to sell the PLC in a "bare" sale.

  This bargained-for exchanged is the key fact that shows each VAR's installed PLCs is indeed warrantied.  The facts show that Radwell has not backed up its interpretation that Rockwell does not honor its warranties with evidence that would show that to a jury, as *Celotex* requires.   In addition and importantly, the facts also show that the end-user gets the benefit of Rockwell's warranty even if the

end-user is not the actual recipient of the warranty.   To clarify this with a simple analogy:  when the motherboard in a consumer's laptop from, for example Acer, becomes corrupted within the warranty period, Acer does not refuse to fix the laptop because the motherboard came from Intel or Qualcomm. Rather, Acer takes back the computer and works with the motherboard manufacturer, **with whom Acer has the warranty**, to fix the motherboard or replace it.  An even simpler analogy is: when a consumer's Maytag dishwasher goes on the blink within the warranty period, Maytag replaces the motor (or whatever broke) because Maytag has a warranty with the motor manufacturer.  Such replacement is not a "bare" sale but repair under a warranty.

Likewise, in this case, even if the warranty period has run on the Rockwell PLC but the end-user now needs a new PLC, the VARs replacement of the out-of-warranty PLC is still not a "bare' sale but simply a repair of its value-added installation with a new PLC for which Rockwell gives the VAR a new warranty.   The point here is that, in a machine, a factory installation or a panel built by a VAR with a Rockwell PLC, the end-user itself doesn't go back to Rockwell to get the installation fixed, but to the VAR which in turn reverts to Rockwell.  To run the point to ground, the VAR that builds the installation, etc. is like Whirlpool to whom the customer reverts when the dish washer breaks within the warranty period.  The VAR can then revert to Rockwell for a PLC repair or replacement within the Rockwell warranty period.  And if the warranty period has ended, the VAR may replace the PLC with a new one bought from an AD and which now has a new warranty.

Moreover, for downstream repair scenarios, Radwell also asserts, without a showing of facts, that, since VARs do not predictably get a warranty from Rockwell, then the consumer cannot possibly be assured of a warranty on the PLC.   For the reasons discussed above, the relationship between Rockwell and its VARs is not comparable to the situation in *SKF*.   Here, there is NO discretion as to whether Rockwell honors its warranty to VARs so long as they abide by the bargained-for exchange. There can be **no** confusion to and by the end user that the PLC installed, replaced, or repaired in its value-added installation is in fact covered by a Rockwell warranty, regardless of the pathway by which the warranty is honored.

Radwell has elicited no facts to detail how VARs extend Rockwell's warranties to the end-user. Nor has Radwell evidenced that Rockwell does not honor its warranty consistently whenever the VAR notifies Rockwell of a problem with the installed PLC.  However, Rockwell has provided testimony that a VAR, as Rockwell's customer, expects Rockwell to honor its warranty on the PLC upon a customer complaint from the end-user and does in fact honor its warranty with the VAR. *See* Declaration of Paul Tanck, Ex. 20 (Deposition of Rodney Michael, 27 March 2018) at 71:3-72:5) ("I said that the OEM might offer a two-year warranty on the product. That's their prerogative. But if the product fails within the warranty period that we've given the OEM and the customer returns it to them, we will honor that warranty through the OEM."))    To the point, Radwell does not dispute this testimony.

The undisputed material facts show Rockwell has met its burden under both *Celotex* and *SKF*, whereas Radwell has not met its burden.   It is undisputed from the AD agreement and undisputed testimony from Rockwell managers that Rockwell consistently extends a warranty to every one of its VARs, i.e., its customers, that are entitled to buy PLCs at a discounted price.  No VAR gets to install Rockwell PLCs into its value-added installation unless it has agreed to at least an informal bargained-for exchange with Rockwell.  Since 95% of all Rockwell sales are executed by ADs to VARs, and all such VARs must promise not to engage in "bare" sales to become eligible to buy PLCs, **ALL** 95 % of Rockwell's total PLC sales to VARs must be deemed conforming because a material difference, the Rockwell's warranty, necessarily and indisputably accompanies each sale.   Accordingly, Radwell can have no defense to trademark infringement as delineated in *SKF* and *Deere-Bourdeau* because Rockwell does not condone or actually allow more than 5% of its total U.S. PLC sales to be non-conforming. Moreover, neither can the remainder 5% of U.S. PLC sales made by Rockwell itself be seen as non-conforming because they are made directly to end-users and carry Rockwell's warranty.

Since the total number of Rockwell's U.S. PLC sales fall well within the percentage considered by *SKF* and *Deere-Bourdeau* as NOT SUBSTANTIALLY ALL, this Court finds that Radwell is liable for trademark infringement and lacks a defense to that liability.  Accordingly, the Court grants Rockwell's motion for summary judgment of Count I for trademark infringement, and denies Radwell's motion for summary judgment of no trademark infringement under that Count.

### 4.3.2   Count II:   False Advertising

Rockwell also seeks summary judgment on Count II of the complaint (ECF Doc. 140 ¶¶ 4017-411) under § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).[28]   Rockwell alleged Radwell falsely marketed Rockwell's nonconforming PLCs—i.e., those lacking Rockwell's warranty—as legitimate Rockwell products to unsuspecting consumers. *Id.*   In the Third Circuit, a plaintiff establishes a false advertising claim[29] by showing:

---

[28] 15 U.S. Code § 1125. False designations of origin, false descriptions, and dilution forbidden

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person [THIS SECTION PROHIBITS **FALSE DESIGNATION**] , or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act  [THIS SECTION PROHIBITS **FALSE ADVERTISING** ]

[29] In the Third Circuit, different standards govern false designation and false advertising.  *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 716 n. 45 (M.D. Pa. 2010) [*citing Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) ["In

1) defendant made false or misleading statements as to his own product [or another's];

2) actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3) the deception is material since it is likely to influence purchasing decisions;

4) the advertised goods traveled in interstate commerce; and

5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Warner–Lambert v. Breathasure*, 204 F.3d 87, 91–92 (3d Cir.2000) [*citing Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir.1994)].

The standard of proof for liability under the Lanham Act depends on the type of relief sought. *See Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648-49 (3d Cir. 1958); *see also Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.Supp. 2d 384, 480 (D.N.J. 2009) [*quoting Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("A plaintiff suing to enjoin conduct that violates Lanham Act need not prove specific damage. In contrast, courts require a heightened level of proof of injury in order to recover money damages.")]. In its complaint (ECF Doc. 140 ¶419), Rockwell seeks injunctive relief[30] (*Id.* at Prayer for Relief at §B (b), (d), and (e)) and damages.[31] *Id.* Prayer for Relief at §D (1) damages. Consequently, in considering this count, the Court looks to Rockwell's showing of specific damage within the context of demonstrating the five elements below.

**1) Falsity**

A false or misleading statement supports a cause of action under the Lanham Act if it is "either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014) [internal quotations omitted] [*citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)]. If unable to prove the claim literally false, the plaintiff must prove the statement to be deceptive or misleading. "A determination of literal falsity rests on an analysis of the message in context." *Rhone-Poulenc Rorer Pharms.*, 19 F.3d at 129 [*citing U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990). In analyzing that context, courts in this Circuit consider "whether statements are false or misleading at the time they are made." *Bracco Diagnostics Inc.*, 627 F.Supp. 2d at 464 [internal quotation marks omitted]. "[O]nly an unambiguous message can be literally false." *Novartis*, 290 F.3d at 587. A literally false statement can be either expressed or imply in its entirety to the audience a claim as clearly as if it had been explicit. *Id.*

---

fact, (a) (1) (A) requires only a likelihood of confusion whereas claims of impliedly false statements under (a) (1) (B) require showing actual confusion or misleading statements."]].

[30] to prohibit Radwell's use of Rockwell's marks or other source identifying indicia to market, advertise or designate the origin of products

[31] to be determined, that Rockwell has suffered as a result of Radwell's sales and marketing of Unauthorized Rockwell Products

In the complaint, Rockwell alleges some examples of Radwell's false advertising.   ECF Doc ¶¶ 307-308, 337, 339, 341.  For example, Radwell advertised the nonconforming Rockwell-branded products it sells as "FNFP – Factory New Factory Package / Factory Warranty." (Exhibit J at 4.).   In addition, there is evidence Radwell knew it was giving false information.  Radwell's lead inventory manager, Jenna DiBernardo, emailed Edward Iannuzzi, Radwell's Global Purchasing Manager, stating: "I feel like we're shooting ourselves in the foot by sending [customers] what is essentially surplus and calling it [factory new]" and "I don't necessarily agree with the product that we are sending out all the time is [factory new]."  In response, Ed Iannuzi replied to her that selling products in this manner was directed by Brian Radwell, Radwell's President and CEO.  ECF Doc. 595-1 ¶17 (Plaintiff's Supplemental Statement of Material Facts) citing ECF Doc. 530-3 (Declaration of Paul Tanck, Exhibit 14, (Jenna DiBernardo email to Edward Iannuzzi et al. dated Feb 2016)).  Radwell does not dispute this.

As discussed above for Count I, Radwell does not and cannot sell a Rockwell-branded product having a Rockwell factory warranty since it is neither a Rockwell AD or a VAR engaged in a bargained-for exchange with Rockwell. Although Radwell has since amended its website (ECF Doc. 140 ¶307 n. 4) to remove this falsity, nonetheless the Lanham Act applies to the statement at the time it was made. *Bracco Diagnostics Inc.*, 627 F.Supp. 2d at 464.  Consequently, the Court finds this Radwell statement literally false.

In addition, Rockwell alleges Radwell falsely advertised in its product catalogs, especially for October 2011, that Radwell's Factory New Factory Package ["FNFP"} products come with a "factory warranty.  ECF Doc. 104 (Complaint) ¶307 *citing* ECF Doc. 104-11, Exhibit K at 1, 5 (excerpt from Radwell's October 2011 catalog).)337.  For the reasons stated above, the Court also finds Radwell set forth literally false statements in these catalogs directed towards consumers.

Moreover, at the time of the complaint (at least as late as 28 March 2017), Radwell had changed its marketing description of Rockwell-branded products to advertise four levels of these, based on their newness.  Rockwell alleges that for each level of product Radwell offered a misleading statement.  For example, for the newest, unused products, Radwell stated that "the Original Manufacturer's warranty **may** not apply" (emphasis added).  ECF Doc. 104 (Complaint) ¶341.  Knowing it was neither an authorized distributor nor a VAR, and its sales could not be entitled to a Rockwell warranty, such a statement cannot be termed ambiguous because Radwell could have known ONLY that Rockwell's manufacturer warranty would **never** apply to Radwell goods.   In considering the entire context of this statement, the Court also finds this Radwell statement literally false and therefore that Rockwell has shown the element of falsity.

### 2) Deception of a Substantial Portion of the Intended Audience

As to the second element, if a plaintiff proves that an advertisement is unambiguous and literally false, actual deception or a tendency to deceive is presumed. *Pernod Ricard*, 653 F.3d 241, 248 (3d Cir. 2011); *Novartis*, 290 F.3d at 586. In such a situation, the Third Circuit has not required a plaintiff to produce a properly conducted survey to demonstrate actual deception. *See Novartis*, 290 F.3d at 587 [*finding* a plaintiff is not required to produce and rely on a survey when "consumer deception can be determined by examining the ...advertising on its face"]. Besides the presumption of actual deception based on Radwell's false statements, as discussed in the previous paragraph, there is evidence of intent to -deceive from the DiBernardo-Ianuzzi email exchange. The Court finds Rockwell has shown this element.

### 3) Materiality

"The materiality inquiry focuses on whether the false or misleading statement is likely to make a difference to consumers." *Bracco Diagnostics,* 627 F.Supp.2d at 478 (internal quotations omitted). Similar to the discussion of element two, materiality can be presumed from a literally false statement for a claim of injunctive relief. *U.S. Healthcare*, 898 F.2d at 922; *see also* Bracco Diagnostics, 627 F.Supp. 2d at 478 ["Once it is determined that a statement is false, it is presumed to be material" [citing *Telebrands Corp. v. E. Mishan & Sons*, No. 97-1414, 1997 WL 232595, at \*22 (S.D.N.Y. 7 May 1997)]]. The Second Circuit has provided further guidance that a statement is material when "the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiffs." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH,* 843 F.3d 48, 70-71 (2d Cir. 2016) [*citing Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)].

Radwell having stated untruths in its advertising, those statements are presumed material under Third Circuit case law. Even assuming *arguendo*, Radwell's statements are not material, under Second Circuit guidance adopted in this Circuit, the materiality element of false advertising is further scrutinized not only under a falsity lens but also with the considerations of competition between the parties and the likelihood defendant's advertising would draw consumers to prefer its products over Rockwell's. Inasmuch as Radwell advertises to the end-user re-sale prices that are cheaper than Rockwell prices AND that a factory warranty is attached to the cheaper Rockwell product, there can be no reasonable inference that Radwell's advertising, even if ambiguous, is not material. The Court finds Rockwell has met this element.

**4) Travel in Interstate Commerce**

Radwell states that it does business in interstate commerce.  ECF Doc. 222 (Radwell's Answer and Counterclaims).   Rockwell does not dispute this.  Plaintiff has satisfied this element.

**5) Injury**

Under both false advertising and false designation standards, a plaintiff must plead and demonstrate "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc.  v. Static Control Components, Inc.*, 572 U.S. 118, 140, 134 S.Ct. 1377, 1395.  The *Lexmark* Court held that a plaintiff demonstrates proximate causation in Lanham Act cases by showing "economic or reputational injury flowing directly from deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133, 134 S.Ct. 1377, 1391.

Rockwell describes two situations in which large, sophisticated corporate consumers, Anheuser-Busch and Universal Studios, bought PLCs from Radwell unaware the Rockwell warranty and other material differences were not included.  Upon their complaint to Rockwell about the lack of quality of the Radwell products, Rockwell informed them these products were non-conforming and lacked Rockwell warranty and other add-ons.  Anheuser-Busch then purchased a replacement from a Rockwell AD.  For Universal Studios, Rockwell replaced the part free of charge.  ECF Doc. 530-1 ¶¶255-256 (Rockwell's Statement of Material Facts Not in Dispute *citing* ECF Doc. 530-3 Declaration of Paul Tanck, Exhibit 9 at 128 (Rodney Michael Direct Witness Statement in the ITC 1074 Investigation, dated 1 June 2018)).

These examples illustrate Radwell's claims of factory new warranty and cheaper price caused even large end-users, who are likely sophisticated purchasers, moved their trade from Rockwell.   It may also be inferred that Rockwell felt compelled to replace the Radwell part because not to do so would have incurred damage to the goodwill of Rockwell's mark.  While these two instances by no means constitute a consumer survey or a specific survey of Rockwell's end-users, as in *Newborn Bros. Co., Inc., v. Albion Engineering Company*, No. 12-2999 (NLH/KMW) 2020 WL 5015571 at *32-33   (D.N.J. 25 August 2020), the Court nonetheless arrives at an obvious conclusion that less sophisticated, direct purchasers would also have been so moved to buy Radwell products because of the cheaper price and deceptive advertising.  The Court finds Rockwell has met the element of specific injury.

Radwell's response to this Count relies on its assertion that it cannot be liable for trademark infringement because the majority of Rockwell's own PLC sales in the U.S. were non-conforming for lacking a warranty, as discussed *supra*.   In essence, Radwell argues, because of the lack of a Rockwell warranty on most of the PLCs Rockwell sold in the U.S., Radwell's own non-conforming PLCs can have

incurred no economic or reputational injury to the goodwill of Rockwell's marks.  ECF Doc. 588 at 8 (Radwell's Opposition to Rockwell's Motion for Summary Judgment).  Moreover, Radwell argues that, since Rockwell has provided no consumer survey, especially of sophisticated, corporate consumers, it cannot imply or show consumers were misled by Radwell's advertisement.  *Id*.

In light of the Court's finding above that Rockwell has met its legal burden to show consumer deception, Radwell bears the burden of showing no consumer injury, which it has not met.  It therefore does not raise a genuine dispute of material fact for this element.  ECF Doc. 528-1 (Radwell's Statement of Material Facts Not in Dispute).  Moreover, in ECF Doc 594-1 (Radwell's Supplemental Statement of Disputed Materials Facts) Radwell is silent about the false advertising claim. Considering the finding *supra* that Radwell's nonconforming goods were, and could not, be accompanied by Rockwell's warranty, Radwell's assertions do not rise to the level of evidence that no consumer has been injured and do not demonstrate a genuine issue of material fact.

Accordingly, the Court grants Rockwell's summary judgment motion as to Count II (False Advertising).

### 4.3.3    Count III:  False Designation of Origin

### Count V: Statutory Unfair Competition under N.J. Stat. Ann. § 56:4-1 *et seq.*

### Count VI: Common Law Unfair Competition

Even though Radwell's motion  (ECF Doc. 527) seeks summary Judgment on Counts I, III, V, VII, VIII, and X",  Radwell's memorandum of law actually provides a combined argument regarding Counts I, III, V, and VI. ECF Doc. 528 at 23 [stating "CONCLUSION AS TO COUNTS I, IIII, V AND VI"].  In other words, Radwell's motion versus its memorandum of law seeks the Court's action on **different counts**.

Given that Radwell's brief does not present a separate argument for each of Counts III, V, and VI, but relies on *SKF* and *Bourdeau* to contend it is not liable for these counts because of its infringement defense, the Court assumes Radwell to apply its arguments for Count 1 to all three Counts, III, V, and VI.

As for Count III, a Lanham Act count, since Radwell's brief presents no standards of law for this, the Court assumes Radwell intended its discussion of the standard for trademark infringement to apply to this count.  Moreover, Radwell has presented no evidence that demonstrate whether a genuine dispute of material fact exists for this count.  Consequently, because of the finding that no defense to

trademark infringement exists here, and since Radwell has not stated its trademark defense applies to false designation of origin, the Court must deny Radwell's summary judgment as to Count III's.  There is insufficient demonstration whether a genuine dispute of material fact applies to this Count.  The Court also notes it has not reviewed any material fact relating to this Count, which allows the Count to be presented at trial.

As for Counts V and VI, this Court declared in *Buying For the Home, LLC v. Humble Abode*, LLC, 459 F.Supp.2d 310, 317 (D.N.J. 2006) (Pisano, DJ) that  "the elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law."  Because of the uniformity of legal standards across such claims, the *Humble Abode* court extended its trademark infringement analysis to the plaintiff's state law claims as well.  *Id*. at 317-318 [*citing J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F.Supp.2d 358, 374 (D.N.J.2002) (the "elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law....") and *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.*, 952 F.Supp. *1084, 1091 (D.N.J.1997) (stating* "N.J.S.A. 56:4–1 is the statutory equivalent of Section 43(a) (1) of the Lanham Act")].

Recently, this Court adopted a similar approach in *Newborn Bros.*, 2020 WL 5015571, at *39 n. 11.  "The parties' briefs make no distinction between the Lanham Act claim and the unfair competition claim under New Jersey common law. The legal analysis is the same for both claims [citations omitted] ...Having concluded  ... Plaintiff has made out its claims under the Lanham Act, the Court reaches the same conclusion regarding Plaintiff's state law claim without further analysis necessary." *Id.*

Guided by *Humble Abode* and *Newborn Bros*. and based on the discussion and decision *supra* on Count I for trademark infringement, this Court denies Radwell's motion for Summary Judgment as to  , Count V (N.J. statutory unfair competition), and Count VI (common law unfair competition). To be clear, these Counts V and VI are summarily adjudicated here.

**4.4      Count VII:  Tortious Interference with Contract**

**Count VIII: Aiding and Abetting Tortious Interference with Contract**

Rockwell seeks a grant of summary judgment on the Tortious Interference Counts, VII and VIII; Radwell seeks a denial.  In interpreting New Jersey law, the Third Circuit has found "a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir.1993) (citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir.1992); *Printing Mart–Morristown*, 563 A.2d at 37)." *Mylan Inc. v. Smith*

*Kline Beecham,* 723 F.3d 413, 421 (3d Cir. 2013).  Under New Jersey law, to prevail on a claim of tortious interference with contract (and the aiding and abetting thereof), a plaintiff must show the following five elements:

1)  plaintiff's contract (or reasonable expectation of economic benefit or advantage);

2) defendant's knowledge of that contract or expectancy;

3) defendant's wrongful, intentional interference with that contract or expectancy;

4) reasonable probability the plaintiff would have received the anticipated economic benefit in the absence of interference, i.e. proximate cause; and

5) damages resulting from defendant's interference.  *Fineman,* 980 F.2d at 186; *Printing Mart– Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 563 A.2d 31, 37 (N.J. 1989); *see also Amgro, Inc. v. Lincoln General Ins. Co.,* 361 F. App'x 338, 345 n. 9 (3d Cir.2010) [*quoting Velop, Inc. v. Kaplan,* 301 N.J. Super. 32, 693 A.2d 917, 926 (N.J.Super.1997)].

 New Jersey courts have patterned this cause of action after the *Restatement (Second) Torts* §§ 766A and 766B. *See, e.g., Printing Mart,* 563 A.2d at 37; *Norwood Easthill Assocs. v. Norwood Easthill Watch,* 222 N.J. Super. 378, 536 A.2d 1317, 1319 (App.Div.1988).  Element 3 is known as "malice" and is the *sine qua non* of this tort. *See Matrix Essentials, Inc. v. Cosmetic Gallery Inc.*, 870 F.Supp. 1237, 1248 (D.N.J. 1994) [*citing Printing Mart,* 563 A.2d at 37 (internal citations omitted)].  *See also Norwood Easthill Assocs.,* 222 N.J. Super. at 384, 536 A.2d at 1320 ["the bare elements of the tort of malicious interference with contractual relations are actual interference with a contract plus proof of the malicious nature of that interference."].

 Proving malice does not require plaintiff to show ill will, but 'is defined to mean that the harm was inflicted intentionally and without justification or excuse.' *Printing Mart,* 116 N.J. at 751, 563 A.2d at 37." *See also Matrix Essentials*, 870 F.Supp. at 1248.  Moreover, the *Printing Mart* Court concluded the New Jersey 'malice' inquiry to be substantially similar to the analysis in the *Restatement (Second) Torts* § 767 whether conduct is "improper" (*Printing Mart,* 116 N.J. at 752, 563 A.2d at 37), which  New Jersey Courts have refined as a violation of standards of 'socially acceptable conduct. *Matrix Essentials*, 870 F.Supp. at 1248 [internal quotations omitted].

 Malice being the key element to resolving liability for these torts, both parties' arguments focus on it.  Rockwell must show not only that Radwell acted with intentionality and without justification or excuse in interfering with Rockwell's contracts but that the interference is the but-for cause of the damages Rockwell incurred. Radwell must show the converse.  That is, intentionality and proximate cause or the lack of them must be shown at a minimum, otherwise there lies a genuine issue of material dispute as to this Count.

### 1)   Radwell's knowledge of Rockwell's contracts

Rockwell asserts Radwell knew about the AD agreement and the Unauthorized Third Party Reseller Policy ["UTPR"], both of which obligated ADs not to sell authorized Rockwell products to VARs who would engage in "bare" resales.  ECF 642:4-5 (Rockwell's Reply for its SJ Motion) citing ECF Doc. 530-1 ¶¶ 158-159, 163 (Rockwell's Statement of Undisputed Material Facts).  Radwell disputes this.  ECF Doc. 588 (Radwell's Opposition to Rockwell's SJ Motion).

### 2)   Malice

Radwell argues Rockwell relied on an incorrect legal standard for demonstrating malice and that the correct one comes from the *Restatement (Second) of Torts §767*, which named seven factors[32] for determining whether intentional interference with a contract is "improper".  ECF Doc. 635:13-14 (Radwell's Reply for its SJ Motion). In turn, Rockwell argues that, in *Varrallo v. Hammond, Inc.*, 94 F.3d 842, 848-849, the Third Circuit's review of malice did not follow the Restatement 7-factor test. Rockwell argues there is no requirement in the Third Circuit to depend exclusively on the seven factor analysis of the *Restatement (Second) of Torts §767*.  ECF Doc. 642:5 (Rockwell's Reply for its SJ Motion).

In addition to the disagreement over the proper legal standard, the parties dispute whether Radwell's behavior actually demonstrates malice.  Rockwell asserts that a common Radwell tactic was to induce certain entities to represent themselves to ADs as "VARs" ["the phony VARs"] in order to buy Rockwell goods at the Rockwell discount price.  ECF Doc. 530:10-12 (Rockwell's SJ motion) [citing ECF Doc. 530-1 ¶¶169-75, 190-91 and 197-208 (Rockwell's Statement of Undisputed Material Facts)]. Rockwell further alleges Radwell induced some VARs that had already promised Rockwell not to re-sell PLCs without adding value to break that promise. *Id.* [citing ECF Doc. 530-1 ¶¶160-162 (Rockwell's Statement of Undisputed Material Facts)]. The inference is that both kinds of VARs engaged in "bare" sales of Rockwell goods to Radwell, which facilitated Radwell's competitive business strategy reliant on acquiring discounted Rockwell PLCs and arbitraging a resale price that was higher than Radwell's cost but lower than Rockwell's price.   Rockwell argues Radwell's inducement has two malicious effects: 1) Rockwell induced genuine VARs to breach their promise to Rockwell; 2) Radwell's inducement of phony and genuine VARs to deceive ADs caused the ADs to breach unwittingly their AD agreements with Rockwell. For Rockwell, it is Radwell's inducement that grounds the interference and demonstrates malice.  *Id. at 12.*

---

[32] These  are:  (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the party with whom the actor interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other party; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Radwell argues Rockwell has merely described a presumed generalized behavioral tactic but not provided specific evidence of:

an identified supplier, i.e., VAR, or

any particular contract the VAR had with Rockwell; or

a specific breaching act by the VAR; or

a specific tortious act of interference by Radwell.

Because of the lack of evidence on Rockwell's part, Radwell argues there can be no genuine dispute of material fact that Rockwell has failed to show malice. To the point, Radwell argues Rockwell merely asserts a supposition about Radwell's generalized strategy without support from specific facts. ECF Doc. 588:9 (Radwell's Opposition to Rockwell's SJ).

Radwell further asserts that Rockwell's claim—that Radwell's inducement to break a VAR's promises grounds the tort—must fail. Radwell cites Second Circuit case law for the proposition that where the "authorized seller" "needed no inducement to sell" to the "unacceptable retailer" there can be no interference. *Id.* at 10 [citing *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F.Supp. 2d 462, 476-77 (S.D.N.Y. 2000) and *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir. 1990). The Court takes note that Radwell is arguing the law but not affirmatively denying Rockwell's assertion about Radwell's generalized strategy of deception.

The Court appreciates that competitive business tactics by themselves need not necessarily rise to the level of malice that amounts to the proximate cause of damages. It's one thing to pose as a VAR to an AD and lie about not reselling PLCs in order to acquire Rockwell's goods. But, it's quite another thing to show that this misrepresentation, without more, caused damages. And then again, it's quite another thing to cajole or partner with an AD to join in a price arbitraging scheme whereby both the AD and Radwell take advantage of Rockwell's discount pricing offered to ADs.

Since the arguments on both sides lack a certain vigor in showing / refuting intentional, unjustified behavior that resulted in damages, the Court ends the inquiry here because it has already found a genuine dispute as to the material facts of tortious interference with contract. Absent a legal finding that a tort has occurred, there can be no conclusion as to the aiding and abetting of that as-yet-undetermined tort. *State of N.J. Dep't. of Treasury, Div. of Inv. ex rel. McCormac v. Quent Comm'cations Int'l, Inc.*, 387 N.J. Super. 469, 481 (App. Div. 2006). Consequently, the Court denies Rockwell's motion for summary judgment as to Counts VII and VII.

### 4.5    Count X:  Unjust Enrichment

Radwell seeks summary judgment of this Count relying on *In re Gerber Probiotic Sales Practices Litigation,* No. 12–835 (JLL), 2014 WL 1310038 (D.N.J. 31 March 2014) for the proposition that "New

Jersey does not recognize unjust enrichment as an independent tort cause of action." *Id.* at \*41 *citing Castro v. NYT Television*, 370 N.J. Super. 282, 299 (App. Div. 2004). ECF Doc. 528:32 (Radwell's SJ Motion.

In *Neuss v. Rubi Rose, LLC*, No. 16–2339 (MAS), 2017 WL 2367056 at \*8 (D.N.J. 31 May 2017) [citations omitted], this Court recognized *Castro* as determinative New Jersey case law on the application of unjust enrichment liability. Specifically, the *Castro* court explained "unjust enrichment is a familiar basis for imposition of liability in the law of contracts. *See Restatement (Second) of Contracts* § 345(d) (1981)." *Castro*, 370 N.J. Super, at 299. However, "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion". *Id.* "Rather, in the tort setting, 'an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched).' " *Id.* [*quoting Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999)].

Rockwell has not effectively marshalled facts to demonstrate how Radwell's alleged unjust enrichment could remotely lie in a contract or quasi-contract legal theory or in the tort of fraud. ECF Doc. 595: 39-40 (Rockwell's Opposition to Radwell's SJ Motion).

Accordingly, the Court grants Radwell's summary judgment motion as to Count X.

## 4.6    Radwell's Counterclaims

As a preliminary matter, the Court reviews Rockwell's argument that Radwell lacks standing to bring any antitrust claims because it is not a lawful "market competitor". ECF Doc. 642: 5-6. Rockwell generally relies on *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 599, 71 S.Ct. 971, 95 L.Ed. 1199 (1951)[33]. But, *Timken* states "[a] trademark cannot be legally used as a device for Sherman Act violation" (*Id.*), does not address standing specifically, and is not particularly useful. Specifically, Rockwell relies *on Cent. Benefits Mut. Ins. Co. v Blue Cross & Blue Shield Ass'n*, 711 F.Supp. 1423 (S.D. Ohio 1989), where the court concluded, "Only a party who is directly and adversely affected by the alleged antitrust violations can raise **the antitrust defense against claims of trademark infringement.**" *Id.* at 1434). Rockwell implies that, since Radwell is no "market competitor", Radwell cannot be adversely affected by alleged antitrust violations and can have no standing to antitrust counterclaims.

However, Rockwell has not correctly interpreted *Cent. Benefi*ts as to whether a putative trademark infringer has standing to claim the mark holder violates antitrust laws. To prove Radwell's

---

[33] For the sake of thoroughness, *Timken* was overruled by *Copperweld Corp. v. Independence Tubing Corp.* 467 U.S. 752, 104 S.Ct. 273, 181 L.Ed.2d 628 on other grounds not relevant here.

lack of standing, Rockwell must show Radwell's **antitrust defense against trademark infringement** depends ONLY on, and requires, Radwell's allegations that the trademarks themselves have been misused, the so-called trademark misuse defense.  *6 McCarthy on Trademarks and Unfair Competition § 31:91* (5th ed., Sept 2020 Update), Defenses to Infringement of Trademarks.

Put differently, Rockwell must prove that Radwell asserts the trademarks are the basic and crucial tool Rockwell uses to accomplish a violation of the antitrust laws.  *See Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena*, 298 F. Supp. 1309 (S.D.N.Y. 1969), modified, 433 F.2d 686, 167 U.S.P.Q. 641 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 29 L. Ed. 2d 680, 91 S. Ct. 2205 (1971) [for the ground-breaking case on the subject and possibly the most thorough].

 This is the trademark misuse issue raised in *Cent. Benefits Mut. Ins. C*o.; but it is not the issue Radwell raised here.  As noted and discussed below, Radwell's antitrust allegations noticeably avoid the mention of trademarks or the commerce of marked products, but emphasize alleged, "collateral" behavior of Rockwell and its ADs to boycott Radwell from acquiring Rockwell's PLCs.   These allegations do not implicate the misuse of the Rockwell's marks themselves.  Accordingly, the Court finds that Rockwell has not proved Radwell lacks standing to assert its antitrust counterclaims.

### 4.6.1   Sherman Act §1

In its counterclaims (ECF Doc.222), Radwell asserts antitrust and tortious interference counter claims against Rockwell, specifically,

Conspiracy of Restraint of Trade and Commerce under the Sherman Act, 15 U.S.C. §1 (*Id*. ¶¶ 213-223);

Conspiracy to Monopolize and Monopolization under the Sherman Act, 15 U.S.C. §2 (*Id*. ¶¶ 224-237);

State antitrust violations (*Id*. ¶¶ 253-372); and

Tortious Interference ["TI"] with Contract (*Id*. ¶¶238-244), as well as with Prospective Economic Advantage (*Id*. ¶¶ 245-252)

The analysis begins with the antitrust claims.   Sherman Act §1 provides "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal."  The Third Circuit has interpreted that § 1 bars contracts, combinations, and conspiracies that amount to unreasonable restraints of trade. *InterVest, Inc. v. Bloomberg, L.P.,* 340 F.3d 144, 158 (3d Cir.2003). There are two essential components of a § 1 claim: the existence of an agreement, which is the claim's "hallmark," and that the agreement imposes an unreasonable restraint upon trade. *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 117 (3d Cir.1999).   In other words, concerted action devolves to some form of agreement.

To prove these two elements—agreement and unreasonable restraint of trade—the antitrust plaintiff (here Radwell) must show (1) the antitrust defendant's  (here Rockwell) agreement, that is,

concerted action, (2) produced anti-competitive effects within the relevant product and geographic markets, (3) was illegal, and (4) the proximate cause of the antitrust plaintiff's injury. *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir.2010) [*quoting Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir.2005)].

Two kinds of concerted action[34] are defined by their differing end results.  Correspondingly, two separate review standards apply. For concerted action resulting in price-fixing or market allocation by horizontal competitors,[35] the standard of review is a *per se* standard. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007); *see also United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) ("One of the classic examples of a *per se* violation of § 1 is an **agreement between competitors at the same level of the market structure** to allocate territories in order to minimize competition." (emphasis added).

However, for concerted action that "holds the promise of increasing a firm's efficiency and enabling it to compete more effectively", the review applies a rule of reason, which additionally considers the structure of the relevant market, defendants' market power, and, ultimately, anticompetitive effects.  *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed2d, 628. The rule of reason standard is "a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice." *In re Baby Food,* 166 F.3d at 118.

Under either standard, an antitrust plaintiff's burden is to show by a preponderance of the evidence that the antitrust defendant entered into a contract, combination, or conspiracy with one or more other entities, thus proving the required element of concerted action. *Howard Hess,* 602 F.3d at 254; *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) [*quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954)) (given the concerted action requirement, the " 'crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express' ") [alteration in original]; *InterVest [v. Bloomberg L.P.]*, 340 F.3d [144] at 159 [3d Cir. 2003] ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation."). Indeed, **it**

---

[34] Concerted action is defined as a "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Burtch v. Milberg Factors*, 662 F.3d 212, 221 [*quoting In re Ins. Brokerage Antitrust Litigation,* 618 F.3d 300, 315 (3d Cir.2010)) (internal quotation marks omitted)]. "[T]wo or more distinct entities [must] have agreed to take action against the plaintiff," and illustrating concerted action "requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator." *Gordon,* 423 F.3d at 207. Plaintiffs' proofs "must include evidence tending to exclude the possibility of independent action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) [*citing Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775)].

[35] A horizontal market allocation can be broadly defined as an agreement among **existing or potential direct competitors** to divide or otherwise restrict territories, output, customers, or product or service markets among themselves. *See, e.g., U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972) ("an **agreement between competitors at the same level of the market structure** to allocate territories in order to minimize competition"). (emphasis added).

**is a pillar of antitrust law that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."** *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (emphasis added).

As the Supreme Court has opined and countless lower court decisions following have reverberated, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case" and demands a court's careful discernment because mistaken inferences can "chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S., 574, 588, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985). In reviewing Rockwell's motion to deny Radwell's antitrust counterclaims and dismiss them, the Court must exercise "careful discernment" whether Rockwell adduces evidence that no genuine dispute of material fact shows concerted action in a restraint of trade that enhanced its monopolistic power improperly.

In its counterclaims, Radwell asserts Rockwell and its ADs knowingly entered into a contract, combination or conspiracy to unreasonably restrain interstate trade and commerce and to monopolize the relevant market in violation of Sherman Act § 1 and §2. ECF Doc. 222 ¶¶ 213, 225. In essence, the asserted Sherman Act §1 injury is that, aided by the AD agreement (which created an exclusive distributorship network), Rockwell acted concertedly, that is, <u>agreed</u> through additional conduct, with its ADs to refuse to deal with Radwell and others so that the U.S. PLC market underwent reduced price competition and Radwell was closed out of the U.S. PLC market. ECF Doc. 588:12, 14 (Radwell's Opposition to Rockwell's SJ Motion). Simply, Radwell alleges Rockwell's refusal to deal with Radwell is not due solely to the AD agreement prohibiting the ADs "bare" PLC sales (ECF Doc. 588-14, Radwell's Opposition to Rockwell's SJ Motion), but because of Rockwell's additional, collateral agreement with its ADs to refuse to deal with Radwell and others in the U.S. PLC market. Radwell asserts such alleged, additional agreement caused Rockwell to effectively diminish price competition in the U.S. PLC market, which was anti-competitive. ECF Doc. 588 ¶¶214, 217,220.

Generally, the parties dispute not only that Rockwell "agreed" with its ADs to boycott Radwell (and others) but also vigorously disagree on the interpretation of these facts in terms of anti-competitive behavior and the application of relevant legal principles to them.

Before reviewing the proper legal standards, the Court notes a glaring omission in the legal perspective underlying Radwell's counterclaims (ECF Doc. 588). That is, the counterclaims do not really mention that Rockwell's PLCs bear and are covered by in force trademarks. The Court appreciates that Radwell's silence in its counterclaims about Rockwell's ownership of marked goods has the effect of avoiding applicable jurisprudence relating to the intersection of antitrust and intellectual property because such law typically situates the IP owner right in the middle of a government-granted monopoly and gives the IP owner monopoly rights from the beginning. The Court finds that it cannot consider

summary judgment solely from Radwell's reframing of applicable law to involve only antitrust issues, but must also review the facts under the jurisprudence that intertwines intellectual property and antitrust.  Therefore, what follows are two analyses: first, a review of the facts under only antitrust law, which largely confines consideration to the Sherman Act §1 counterclaim, followed by a second review of the intersection of IP and antitrust law, which reverts to a consideration of the Sherman Act §2 counterclaim.

Under an antitrust law only perspective, an exclusive dealing arrangement can be categorized either as a vertical non-price restraint or as a refusal to deal.   In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271–272 (3d Cir. 2012), the Third Circuit declared "there is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, ...; substantial foreclosure, ...; contracts of sufficient duration **to prevent meaningful competition by rivals**, ...; and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects."  (emphasis added)

Moreover, the Supreme Court has revoked its own *per se* standard previously applied to vertical non-price restraints in the distribution of goods.  *Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568, (1977).[36]  The *Continental c*ourt considered the real-world, economic effects of such restraints, such as the possible promotion of interbrand competition, and increasing consumer demand that manufacturers take responsibility for the safety and quality of their products. *Id.* at 55 and at n. 23.

Other courts have also applied the rule of reason to exclusive dealing agreements brought under Sherman Act § 1[37]; so has the Federal Trade Commission.[38]  The cases reflect a common inquiry: (1) Is the particular exclusion at issue is "unreasonably restrictive of competitive conditions" determined

---

[36] *Continental T.V.* is the leading Supreme Court decision on applying rule of reason to such restraints. At issue there was the legality under Sherman Act §1 of Sylvania's product distribution program adopted to stem the sharp decline in its share of the national television market to about only 1 to 2%. To attract more aggressive franchisees, Sylvania limited the number of franchises in any given territory and required each to sell only Sylvania products at only one franchise location in the territory. This strategy enabled Sylvania to increase its market share to approximately 5%.  However, after the plaintiff's franchise tried, over Sylvania's objection, to open an unauthorized outlet in another franchisee's territory, Sylvania ended plaintiff's franchise.
  *See also, Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988), where the Court decided a rule of reason, rather than *per se* analysis, governed an agreement between a manufacturer and one of its dealers to terminate another dealer known for price-cutting; and *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 1988) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, i.e., have some form of horizontal relationship (a/k/a dual distributor arrangement),"

[37] *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678 (2018); *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corporation*, 846 F.3d 1297, 1310 (10th Cir. 2017); *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Company*, 838 F.3d 421, 438 (3d Cir. 2016); *O'Bannon v. National Collegiate Athletic Ass'n*, 802 F.3d 1049, 1069 (9th Cir. 2015); *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335–336 (7th Cir. 2012).

[38] U.S. Department of Justice and FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* (Jan. 12, 2017), Sections 5.3 and 5.4 (distinguishing between the legal standards applied to tying restraints involving intellectual property, versus exclusive dealing restraints involving intellectual property).

by whether the restraint clearly tends to harm competition; or (2)whether it facilitates more effective competition; or (3) at a minimum, leaves competition unaffected.

An initial inquiry is whether Radwell stands as a direct competitor to Rockwell in the relevant U.S. PLC market.  If there is no direct, i.e., horizontal, competitor relation, that affects what standard applies to an allegation of "concerted" action in a refusal to deal or vertical restraint.

The Court agrees with Rockwell that Radwell cannot be considered a direct, horizontally-positioned competitor; Radwell is not a PLC manufacturer.  Doc. 530:6 (Rockwell's SJ Motion).  As a reseller of PLC products manufactured by both Rockwell and other entities, Radwell can be regarded as occupying a distributor status in the PLC market structure.  More or less, Radwell stands at the same level as Rockwell's ADs and not at Rockwell's level, even when one considers that Rockwell sells directly to a small number of end-users, which the Court does not find determinative that Radwell is a competitor.  Radwell claims it is a competitor to Rockwell but its description of such competition is at a distributing / marketing level in the PLC market structure.  The Court finds Radwell is not a direct, horizontal competitor to Rockwell.

Looking at Rockwell's ADs position in the PLC market structure, the Court finds that neither are the ADs direct, horizontal competitors to Rockwell.  This finding contradicts Radwell's assertions, which are used to support its allegation of a hub and spoke conspiracy between Rockwell add its ADs.  ECF Doc. 588:22-27 (Radwell's Opposition to Rockwell's SJ Motion).  The Court finds Rockwell's ADs are at about the same level as Radwell in the PLC market structure.

That Radwell as well as Rockwell ADs are not competitors to Rockwell excludes application of the *per se* standard under Sherman Act §1 (U.S. v. *Topco Assocs.,* 405 U.S.596, 608, 692 S.Ct. 112, 631 L.Ed.2d 515).  This conclusion in concert with the case law cited above confirms that the appropriate standard applicable to Radwell's Sherman Act § 1 counterclaim is a rule of reason.[39]

Applying a rule of reason to Radwell's counterclaims demands that Rockwell show no genuine issue of material fact exists that Rockwell engaged in <u>concerted action with its ADs that was collateral to the AD agreement</u>, which resulted in a price fixing scheme that boycotted Radwell from the distribution of Rockwell branded PLCs.  At the same time, the Court considers Radwell's asserted facts in the light most favorable to it (*Anderson v. Liberty Lobby,* 477 U.S. 242, 255; *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir.2013)) and draws all reasonable inferences in its favor.  *Burns v. Pa. Dep't of Corr.,* 642 F.3d 163, 170 3d Cir.2011).

To be clear, Radwell asserts that the mere existence of the unvarying price points of Rockwell PLCs that the ADs offered to those Rockwell customers (defined as VARs or resellers) unwilling to

---

[39] Especially because *ZF Meritor* applies a rule of reason to a distribution arrangement of non-branded goods and, as discussed above, trademark owners get greater latitude than reasoned in *ZF Mentor* as to how they can restrict distribution of their marked goods.

refrain from "bare" sales  can only evidence concerted action of price fixing between Rockwell and its ADs.  ECF Doc. 588: 14, 18-21 (Radwell Opposition to Rockwell's SJ Motion).  Further, Radwell asserts there are numerous disputed facts that evidence a hub and spoke arrangement of equals between Rockwell and its ADs that resulted in price fixing in such a way that boycotted Radwell from the U.S. PLC market.  *See especially*, ECF Doc. 594¶¶ 283, 284-317, 303 (Radwell's Supplemental Statement of Disputed Material Facts)

In reviewing the AD  agreement (ECF Doc. No. 531-3, Exhibit 27), the Court finds it neither states, suggests, nor alludes to "collateral" (i.e. additional) concerted action between Rockwell and its ADs beyond the mere obligations of the AD agreement.  To the contrary, the agreement states at §3.8

"Distributors will retain the exclusive and independent right to establish its resale prices for the Products, notwithstanding any suggested prices, multipliers, or discount rate published or specified by Rockwell Automation, whether generally or specific to any Distributor customer or Product order".

Thus, the formal language of the AD agreement itself expressly declares ADs independence to set their own <u>resale</u> price of PLCs independent of Rockwell's proposals and persuasion and to thereby control their own revenue in the distribution of U.S. Rockwell-branded PLCs.  The AD agreement itself thus negates Radwell's reliance on it as a logical support of "collateral" concerted action between Rockwell and its ADs.

In its Opposition to Rockwell's SJ Motion (ECF Doc. 588), Radwell's allegations of "collateral" concerted action and of the existence of a hub and spoke arrangement that fixed prices of Rockwell PLCs sold in the U.S. arise exclusively from its interpretation of two items:
the facts cited in its Statement of Disputed Facts (ECF Doc. 594)  (which are generally undisputed); and its reliance on a case it did not properly identify in the discussion and actually omitted from the Table of Authorities, *Rossi et al. v. Standard Roofing, Inc. et al.*, 156 F.3d 452 (3d Cir. 1998).  Through paragraph after paragraph in its Statement of Disputed Facts (ECF Doc. 594), Radwell discusses collaboration between Rockwell and its ADs in determining policy regarding pricing and gray market goods exclusion. Radwell interprets the years-long collaborative behavior between Rockwell and the various AD committees as direct or strong circumstantial evidence of price fixing that excluded Radwell and others. *See* ECF Doc. 594¶¶226-317.  Further, Radwell relies on *Rossi* to support its argument that Rockwell's collaboration with its ADs to end gray market sales in the U.S. and to adopt the required obligation "no sales to 'bare' resellers" can only be seen as direct proof of "collateral" concerted action of price fixing. ECF Doc.588:23 (Radwell Opposition to Rockwell's SJ Motion).

Even taking all 540 paragraphs of Radwell's Statement of Disputed Facts (ECF Doc. 594) in the light most favorable to it, the Court cannot agree with this interpretation.  The meetings where Rockwell and a subset of its ADs discussed standard, negotiated, or long term pricing of PLCs (*Id.*

¶¶284-343) or efforts to prevent gray market sales (*See especially, Id.* ¶¶205-225 and 344-401) do not infer necessarily "collateral" concerted action even though Radwell's expert, Dr. Ramus, opined such collaboration can indicate the workings of a cartel. *Id.*¶283.

A truism is that an expert's interpretation of business behavior and strategy does not evidence a fact. In relying on Radwell's own Statement of Disputed Facts (ECF Doc. 594), many of which come directly from Rockwell declarations or discovery from Rockwell and as such cannot be considered disputed, the Court concludes there is no genuine issue of material fact that Rockwell acted unilaterally in managing the pricing of its PLCs and who could buy them.

As for pricing, *see especially*, *Id.*¶285 in that Rockwell and the ADs determined that, for negotiated special pricing, it was "best to leave the ultimate decision on price to Rockwell"; *Id.*¶303 stating "In buying product from Rockwell, all ADs buy from Rockwell at the exact same price"; and, *Id.* ¶331 stating "Long term agreements …generally are negotiated by Rockwell on the distributor's behalf with the customer, including on price." Further, that *Id.* ¶320 states "…an ADs failure to provide [standard] pricing in line with Rockwell's direction can result in the [ADs] loss of pricing credits" can work in several ways: one is that Rockwell tamps down on an AD overcharging the VAR; the other is that Rockwell maintains a standard price so as to prevent ADs from over competing with each other; an a third is simply to keep the PLC price high. All of these possible reasons why Rockwell is controlling the price may be irrelevant; the fact shows that Rockwell, and not a cartel of Rockwell and the ADs, is controlling the price, i.e., unilateral action.

As for preventing gray market sales, *see especially, Id.* ¶388, stating:

"Rockwell implemented a disciplinary scheme for ADs that directly or indirectly assisted 'Gray Market' activity (citation omitted.) The discipline included: a lower score on the Distributor Operations Scorecard that Rockwell uses to evaluate its ADs performance; warning letter sent to the ADs that included a timeline for the AD to remedy its behavior; and, for continued violations, potential loss of an ADs (distributorship territory)"; *Id.* ¶390 clarifying that in developing strategy for notifying its ADs which resellers were NOT Ok, Rockwell messaged its ADs with 'All reported reseller submissions are investigated' and if confirmed, "added to the global list' … for all distributors to view /access"; and *Id.* ¶395 stating "Rockwell undertook efforts to provide its ADSs with 'Gray Market Awareness Training" to ensure the ADs would implement appropriate procedures to eliminate 'Gray Market' sales".

Far from indicating "collateral" behavior, Radwell's own submissions show that, while offering advice, ideas, persuasion, and even coercion on how to price Rockwell PLCs downstream, Rockwell gave no authority to ADs to set Rockwell's prices or to shape Rockwell's policies concerning VARs. Only Rockwell had unilateral authority to set (even with ADs input certainly) its pricing to its ADs and its resell restriction policies. This is not say that ADs had no input; they were clearly allowed to set their own downstream prices, even if they were eager to comply with Rockwell's suggestions. Pricing and

distribution obligations flowed ONE WAY to the ADs, from Rockwell.  A ONE WAY flow of obligations indicates a vertical structure of unilateral control, not "collateral" collusion, even taking into account there was cooperation and exchange of ideas among Rockwell and its ADs.  It was Rockwell that obligated pricing procedure and gray market exclusion behavior.  ADs had no choice but to comply with and conform to the pricing demands and gray market prevention obligations in order to remain in the Rockwell distribution structure.

Thus, relying solely on traditional Sherman Act §1 legal theories and on a review of Radwell's own statement of facts, the Court finds an absence of a genuine issue of material fact.  Radwell's facts applied to a correct  Sherman Act §1 standard shows Rockwell neither engaged in concerted action nor colluded with its ADs to use price fixing and exclusionary obligations that effectively boycotted Radwell from the U.S. PLC market.

Accordingly, the Court finds there is no genuine issue of material fact that Rockwell has violated Sherman Act § 1 and grants Rockwell's summary judgment motion to dismiss this Radwell counterclaim.

### 4.6.2    Sherman Act §2

Analyzing the rights of an IP owner to act as a monopolist in exploiting its own IP implicates Sherman Act §2.  Coupling *Am. Needle, Inc. v. National Football League,* 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010) with *Copperweld,* 467 U.S., at 767, 104 S.Ct. 2731 leads to the conclusion that monopolization, or the threat of it , is a more narrow category of conduct than restraint of trade, consequently requiring even greater discernment in analyzing it.   Moreover, *the* Supreme Court has established the now axiomatic principle that an IP holder / owner has the fundamental right to <u>unilaterally</u> choose its business partners and refuse to deal with those not selected. *See, e.g., Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 129 S. Ct. 1109, 1116, 172 L. Ed. 2d 836 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 124 S. Ct. 872, 157 L. Ed. 2d 823, (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his <u>own independent discretion</u> as to parties with whom he will deal.' ") Thus, having determined no genuine issue of material fact exists as to whether Rockwell acted with "collateral" action to refuse to deal with Radwell, the Court looks at whether Rockwell used its monopoly power over its trademarks to improperly reduce competition in the U.S. PLC market when it refused to deal with Radwell.

Decisions rooted in antitrust law that concern forcing trademark owners to distribute their marked goods to actual or potential competitors strongly consider the difference between the

intellectual property rights of trademarks vs. those of patents or copyrights.  That is, since a trademark excludes others from using identical / similar marks likely to cause confusion as to the source or quality of a product, it does not confer a legal monopoly over a good; it confers rights to a name only. *See, e.g., Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) ("As other courts and commentators have observed, trademarks are by their very nature non-exclusionary."); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, (7th Cir. 1976).  Further, unlike patent and copyright rights, the actual protection provided by a trademark goes beyond the mark owner's interests and extends to the public, by preventing deception or confusion and thus unfair competition.[40]  And, it is because of the specter of possible consumer confusion[41] that attempts to coerce a trademark owner into granting a license or authorization to those who would compete horizontally or vertically with it are often more liberally decided than antitrust decisions regarding other intellectual property.[42]

This greater latitude to trademark owners is important because of the recent ruling by the Ninth Circuit in *Federal Trade Commission v Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)[43] that is particularly applicable because it deals with Rockwell-like "hypercompetitive" behavior, but in a patent monopoly context.  The *Qualcomm* court resolved that Qualcomm's exercise of its patent monopoly over its Standard Essential Patents ["SEPs"] (relating *inter alia* to communication protocols of devices in 3G and 4G networks), and over its non-SEP protocols and modem chips was NOT a barrier to entry in the 3G and 4G cell phone market space and was not anti-competitive because there were procompetitive effects to Qualcomm's business strategy.

As it turns out, Qualcomm's business strategy looks quite similar to Rockwell's.  Qualcomm, a dominant modem chip manufacturer in the cell phone and other electronic device market, sold its patented modem chips to downstream cell phone manufacturers (such as Apple)--also called OEMs-- **and at the same time also licensed** its SEP communication protocol patents to them. The license of the protocols cost close to nothing so long as the downstream OEMs that bought its patented chips agreed NOT to resell Qualcomm chips to upstream competitors of Qualcomm. *Id.* at 984-985.

Although the Qualcomm SEP communication protocol (which to be clear is patented software) worked with the rivals' chips, Qualcomm demanded from rival chip manufacturers  a much higher

---

[40] *See, e.g., Federal Trade Commission v. Algoma Lumber Co.*, 291 U.S. 67, 78, 54 S. Ct. 315, 78 L. Ed. 655 (1934); *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968).

[41] *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999) (reversing an FTC determination that a dental association's restrictions on discount and quality-of-service advertisements were unreasonable under the "quick look" rule of reason analysis and remanding the case for analysis under the full rule of reason, where the challenged restraints had plausible pro-competitive justifications to protect consumers from possible confusion or deception, and could not simply be presumed to result in higher prices, reduced service quality, or other anti-competitive harm.

[42]  *Dawson Chemical v. Rohm & Haas, Co.*, 448 U.S. 176, 201,100 S.Ct. 260165 L.Ed.2d 696, *Matter of E. I. DuPont De Nemours & Co.*, 96 F.T.C. 653 1980 WL 339053 20 October 1980

[43] At the end of October 2020, the Ninth Circuit refused to re-visit the matter in a hearing *en banc*, which leaves the *Qualcomm* holding in place and the FTC's only option to seek certiorari.  Order, *FTC v. Qualcomm*, 19-cv-16122, ECF Doc. No. 270 (28 Oct 2020 9th Cir).

royalty to license its SEP protocols than it charged e downstream OEMs who promised not to resell. The end result of Qualcomm's business strategy is that its chips were not resold to rival manufacturers, which in effect avoided patent exhaustion of the patented SEP protocols licensed to the OEMs.  Put simply, if OEMs used rival chips in a cell phone, the entire phone production was more expensive than if they used  Qualcomm's chips because Qualcomm, as a patent monopolist, charged both its rival chip manufacturers and OEMs not using a Qualcomm chip a much higher price for licensing the SEP protocols.  At the same time, Qualcomm kept the price of its chips relatively high to its downstream OEMs, who agreed not to resell the Qualcomm chips.  Together the vertical restraint on the Qualcomm chips, the higher price on the Qualcomm chips AND the relatively free license of SEP protocols to compliant OEMs created a *de facto* vertical distribution network that closed out rival chip manufacturers from gaining or even keeping market share.  The cost of Qualcomm chips, even if high, coupled with the relatively free license to use the SEP protocols was just too attractive to use rival chips.  Thus, 1) Qualcomm's patents on both the chips and the SEP protocols coupled with 2) its refusal to license its SEP protocols to rival chip manufacturers and 3) its demand that downstream OEMs not resale Qualcomm chips allowed Qualcomm to exploit its IP monopoly in a way that increased its market share while closing out rival chip manufacturers.

As for the procedural history of *Qualcomm*, Apple in particular, a Qualcomm OEM, wanted to disrupt Qualcomm's strategy.  Apple wanted neither to promise not to resell Qualcomm chips nor to pay for Qualcomm chips at Qualcomm's price.  In essence, Apple wanted to get cheap chips from Qualcomm's rivals while keeping the cheap licensing royalty of Qualcomm's SEP protocols.  It asked the Federal Trade Commission to charge Qualcomm with antitrust violations, that is, Sherman Act §1 1 and §2, for Qualcomm's refusal to its SEP communication protocols for rival chips.  *Id*. at 985-6.  The District Court found for the FTC, that Qualcomm's restraint on licensing the SEP protocols harmed competition.  Qualcomm appealed and the Ninth Circuit reversed (*Id.* at 987) and considered research that shows antitrust economists, and in turn lawyers and judges, tend to treat novel business practices, like Qualcomm's, as automatically anticompetitive  because of the apparent restraint of trade but without looking deeply at the possible procompetitive effects in the market.  *Id*. at 991.

The *Qualcomm* Court kept true to the Sherman Act's requirement, that Qualcomm's business strategy had to be anti-competitive in the relevant markets (*Id*. at 993, 998) and found from the undisputed facts that the only potential chip manufacturer, Intel, in the relevant market during the relevant time period was NOT actually a viable competitor to Qualcomm.  *Id.* at 1004  Thus, the Ninth Circuit concluded that although "[a]nticompetitive behavior is illegal under federal antitrust law[;] [h]ypercompetitive behavior is not." (*Id*. at 1005).  The Ninth Circuit specifically found Qualcomm's obligations on its downstream OEMs—that is, if you want a free SEP license, you must buy Qualcomm chips and you can't resell them to Qualcomm's rivals—did not "impose an anticompetitive surcharge on

rivals' model chip sales" even though rival chip makers had to pay more for the SEP license.   Further this business strategy was not in violation of Sherman Act §2 because Qualcomm is "under no antitrust duty to license rival chip suppliers." *Id*. at 1005.

The Court notes here the remarkable similarity between Qualcomm's strategy and Rockwell's, especially Rockwell's refusal to deal its PLCs covered by IP to any but nominated distributors that in turn must promise contractually not to sell those products to downstream customers who would execute "bare" sales of the PLCs on the open market.  Thus, Rockwell's ADs are akin to Qualcomm's downstream OEMs.

Taking a cue from *Qualcomm,* the Court finds that Rockwell did not violate Sherman Act §2. The *Qualcomm* reasoning applies here: Rockwell's refusal to offer resellers, such as Radwell, its discounted rebate or differentiated pricing did not violate Sherman Act §2 because: 1) Rockwell was exercising its right to sell its monopoly products to entities of its choosing, which for trademarks are upheld more strongly than for patents; and 2) Rockwell's behavior, while hypercompetitive, to close out downstream resellers like Radwell from lower prices of its PLCs nonetheless had pro-competitive effects.

Simply, these effects are the benefits Rockwell as a mark holder provides end-user consumers, which are customers to the VARs.  That is, VARs add value to their customers' PLC installations by ensuring the end-user gets the product it bargains for with the VAR, a product covered by a Rockwell warranty to the VAR.   As the *Qualcomm* court asserted and we agree with, Rockwell was not required to sell its PLCs at a discount price to any entity but was free to choose whom to sell to and for what price.  It was a monopolist by virtue of a government IP grant, trademark, which does not offer exclusionary benefits, like a patent or copyright, and therefore spurred the creation of a closed distribution scheme to limit which entities could access the IP-covered good.  Ultimately, supplying a product to an end-user that bears the promised indicia of quality spurs interbrand competition in that rival manufacturers must compete as to the quality of their products.   The Supreme Court has considered interbrand competition by striving to achieve a better quality product and better product liability coverage to have a procompetitive effect.

As discussed above, there are no disputed facts between the parties about Rockwell's closed distribution system and its effects on Radwell's attempts to disrupt that sow system. The genuine dispute between the parties is the interpretation of how the law applies to those facts.  And, *Qualcomm*, in deciding the law on a similar IP driven distribution system, rules the day.  Accordingly, the Court finds there is no genuine issue of material fact that Rockwell has violated Sherman Act § 2 and grants Rockwell's summary judgment motion to dismiss this Radwell counterclaim.

### 4.6.3   Counterclaim III. Tortious Interference with Existing Contractual Relations and Counterclaim IIV.  Interference with Prospective Economic Advantage

New Jersey courts find actionable tortious interference both when there is an enforceable contract and when there isn't.  *Printing Mart-Morristown v. Sharp Electronics Corp*., 116 N.J. 739, 751, 563 A.2d 31 (1989) [*citing Mayflower Industries v. Thor Corp., 15 N.J. Super.* 337, 339, 83 A.2d 366 (Ch.Div.1951), *aff'd, 9* N.J. *605*, 89 *A.*2d 242 (1952)].  As discussed above for Rockwell's allegations regarding tortious interference, these torts require a showing of some protectable right that has been interfered with through malice by the accused party. Since malice is the *sine qua* non of these torts, Radwell must show there is no genuine dispute of material fact regarding Rockwell's malice.

Radwell asserts that for many years it had distributed considerable quantities of Rockwell PLCs to several large U.S. machine-parts businesses many Rockwell PLCs, and that Rockwell knew this and sent communications to these businesses asking them not to buy Rockwell products from Radwell any longer, warning about the risks of buying gray goods.  ECF Doc. 222 ¶¶198-202; ECF 530:39 (Rockwell's SJ Motion).  Radwell alleges these Rockwell communications formed an institutional practice of pressuring market participants to refuse to buy from Radwell and caused a significant drop in Radwell's commerce, which it had every reason to continue to expect.

Radwell also implies that it is Rockwell's own ADs that funnel Rockwell PLCs to Radwell in violation of their contractual obligation not to.  Radwell suggests Rockwell's suit against Radwell is misplaced and frivolous because Rockwell should be suing its own faithless ADs instead.  Id. ¶¶203-207. Further, Radwell's antitrust injury allegations seem to imply that by itself the contractual prohibition on ADs to sell PLCs to "bare" resellers constitutes interference to Radwell's business relations by forcing it pay higher prices for the Rockwell PLCs and reducing Radwell's ability to compete in supplying "bare" PLCs to its large machine parts customers.  *Id*. ¶208.

The only "malice" Radwell alleges is Rockwell's devoted and intentional behavior to maintain a closed vertical distribution system of its branded PLCs.  Radwell does not allege discriminatory behavior against only itself; to wit, Rockwell's 1074 ITC investigation named several gray goods resellers.  Rather Radwell implies it is entitled to acquire Rockwell's branded PLCs at a discounted price and then to sell them at prices that undercut Rockwell ADs.  Rockwell's attempts to interfere with that entitlement is the basis of these allegations.   But Radwell's sense of entitlement to its business strategy of arbitraging Rockwell's PLCs for a cheaper cost and a cheaper selling price does not give Radwell an untrammeled legal right to that strategy. This is so primarily because Rockwell is actually exercising its legal rights as mark holder to limit the distribution of its branded products.  And taking another cue from *Qualcomm,* such hypercompetitive behavior for a trade mark owner does not indicate by itself malice.

Relying on Radwell's allegations and that Rockwell does not dispute them in essence, the Court finds that, based on the legal standards, Radwell's evidence has not shown a genuine dispute as to the necessary element of malice.  Accordingly, Rockwell cannot be found liable for tortious interference of Radwell's contract or prospective business relations and the Court grants Rockwell's summary judgment motion to dismiss these counterclaims.

### 4.6.4   Counterclaim V:  State Antitrust Law Violations

In its Counterclaims (ECF Doc. 222 ¶¶253-372), Radwell alleges violations of antitrust laws for the following states:

California Cartwright Act, California Business and Professions Code § 16720 *et seq*.;

Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq*.;

Maine Monopolies and Profiteering Law, 10 M.R.S. § 1101 *et seq*.;

Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq*.;

Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-.66;

Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

North Dakota Uniform Antitrust Act, North Dakota Century Code § 51-08.1-01 *et seq*.;

New Mexico Antitrust Act, NMSA 57-1-1 to -15;

New York Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq*.;

South Dakota Codified Laws § 37-1-3.1 *et seq*.;

Vermont Consumer Protection Act, 9 V.S.A § 2451 *et seq*.; and

Wisconsin. Stat. Ann. §§ 133.01-.18.

In its summary judgment motion (ECF Doc. 530:38), Rockwell assertion that the antitrust laws of all 12 states Radwell cites in its counterclaims (see above) have been drafted or are interpreted to be consistent with Sherman Act §1 and §2.  Therefore, the same arguments and reasons for why Radwell's Counterclaims 1 and 2 fail apply.

In its opposition (ECF Doc. 588:44) Radwell does not deny the assertion of similarity between the federal and the state antitrust laws and avers that even if such similarity between the federal and state laws is accepted, Radwell has shown through its marshalled facts and legal arguments that Rockwell has violated each statute.

There is no genuine dispute of material fact that Radwell's cited state laws are similar in standard and interpretation to the Sherman Act sections already reviewed and decided upon.  For reasons discussed above, the Court finds Rockwell has violated none of these state antitrust laws and

grants Rockwell's summary judgment motion as to counterclaim 5 and dismisses it.

**CONCLUSION**

For the reasons discussed above:

As to Complaint Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Summary As to Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability, **DENIES** defendant's Motion for Summary Judgment, and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count II (False Advertising), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count III (False Designation of Origin), the Court **DENIES** defendant's Summary Judgment Motion;

As to Counts V and VI (State and Common Law Unfair Competition), the Court **DENIES** defendant's Motion for Summary Judgment;

As to Counts VII and VIII (Tortious Inference with Contract and Aiding and Abetting Such), the Court **DENIES** the Motions for Summary Judgment of plaintiff and defendant;

As to Count X (Unjust Enrichment), the Court **GRANTS** defendant's Motion for Summary Judgment Motion and enters Judgment in favor of Defendant and against Plaintiff on this Count; and

As to Counterclaims I through VI (Sherman Act §§1 and 2, Tortious Inference with Contract and with Prospective Advantage, and State Law Antitrust), the Court **GRANTS** plaintiff's Motion for Summary Judgment and Judgment is entered in favor of Plaintiff and against Defendant on all of the Counterclaims.

A jury trial for the following issues will be scheduled in due course:

Plaintiff's damages for defendant's liability for trademark infringement and false advertising;

Whether defendant is liable for state and common law unfair competition (Counts V and VI);

Whether defendant is liable for tortious interference in plaintiff's contracts and for aiding and abetting such tortious interference (Counts VII and VIII).

Dated:  24 November 2020

s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Court Judge